KENTUCKY DEPARTMENT OF CORRECTIONS ET AL.
*v.* THOMPSON ET AL.

No. 87–1815.   Argued January 18, 1989—Decided May 15, 1989

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. KENNEDY, J., filed a concurring opinion, *post*. p. 465. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 465.

*Barbara Willett Jones* argued the cause for petitioners. With her on the briefs was *Leslie Patterson Vose*.

*Joseph S. Elder II* argued the cause and filed a brief for respondents.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we consider whether Kentucky prison regulations give state inmates, for purposes of the Fourteenth Amendment, a liberty interest in receiving certain visitors.

---

*A brief of *amici curiae* urging reversal was filed for the State of Tennessee et al. by *W. J. Michael Cody*, Attorney General of Tennessee, and *Michael W. Catalano*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Grace Berg Schaible* of Alaska, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *Joseph Lieberman* of Connecticut, *Robert Butterworth* of Florida, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Michael C. Moore* of Mississippi, *William L. Webster* of Missouri, *Brian McKay* of Nevada, *W. Cary Edwards* of New Jersey, *Hal Stratton* of New Mexico, *Lacy H. Thornburg* of North Carolina, *Anthony J. Celebrezze, Jr.*, of Ohio, *Robert Henry* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *Travis Medlock* of South Carolina, *Robert A. Tellinghuisen* of South Dakota, *Jim Mattox* of Texas, *David L. Wilkinson* of Utah, *Kenneth O. Eikenberry* of Washington, *Don J. Hanaway* of Wisconsin, and *Joseph B. Meyer* of Wyoming.

## I

In September 1976, Kentucky inmates brought a federal class action under 42 U. S. C. § 1983 challenging conditions of confinement in the Kentucky State Penitentiary at Eddyville. Other cases, one of them relating to the Kentucky State Reformatory at La Grange, were consolidated with the one concerning the penitentiary. The litigation was settled by a consent decree dated 28 May 1980, and supplemented 22 July 1980, containing provisions governing a broad range of prison conditions. App. 2–44, 45–55. See *Kendrick* v. *Bland*, 541 F. Supp. 21, 27–50 (WD Ky. 1981); see also *Kendrick* v. *Bland*, 740 F. 2d 432 (CA6 1984). Of sole relevance here, the consent decree provides: "The Bureau of Corrections encourages and agrees to maintain visitation at least at the current level, with minimal restrictions," and to "continue [its] open visiting policy." See 541 F. Supp., at 37.

The Commonwealth in 1981 issued "Corrections Policies and Procedures" governing general prison visitation, including a nonexhaustive list of visitors who may be excluded.[1] Four years later, the reformatory issued its own more de-

---

[1] The relevant provision states:

"Certain visitors who are either a threat to the security or order of the institution or nonconducive to the successful re-entry of the inmate to the community may be excluded. These are, but not restricted to:

"A. The visitor's presence in the institution would constitute a clear and probable danger to the institution's security or interfere with the orderly operation of the institution.

"B. The visitor has a past record of disruptive conduct.

"C. The visitor is under the influence of alcohol or drugs.

"D. The visitor refuses to submit to search, if requested to do so, or show proper identification.

"E. The visitor is directly related to the inmate's criminal behavior.

"F. The visitor is currently on probation or parole and does not have special written permission from both his or her Probation or Parole Officer and the institutional Superintendent." Commonwealth of Kentucky Corrections Policies and Procedures § 403.06 (issued Aug. 28, 1981, effective Sept. 28, 1981); App. 101–102.

tailed "Procedures Memorandum" on the subject of "Visiting Regulations." The memorandum begins with a Statement of Policy and Purpose: "Although administrative staff reserves the right to allow or disallow visits, it is the policy of the Kentucky State Reformatory to respect the right of inmates to have visits in the spirit of the Court decisions and the Consent Decree, while insuring the safety and security of the institution." App. 106. The memorandum then goes on to state that a visitor may be denied entry if his or her presence would constitute a "clear and probable danger to the safety and security of the institution or would interfere with the orderly operation of the institution." ¶ K(1)(a), App. 133. A nonexhaustive list of nine specific reasons for excluding visitors is set forth.[2] The memorandum also states that the

---

[2] The memorandum reads in relevant part:

"K. *Visitor Refused Admittance*

"1. A visitor may be denied a visit at any time if one or more of the following exists or there are reasonable grounds to believe that:

"a. The visitor's presence in the institution would constitute a clear and probable danger to the safety and security of the institution or would interfere with the orderly operation of the institution, including, but not limited to:

"(1) The visitor has a past record of disruptive conduct.

"(2) The visitor is under the influence of alcohol or drugs.

"(3) The visitor refuses to submit to search or show proper identification upon request.

"(4) The visitor is directly related to the inmate's criminal behavior.

"(5) The visit will be detrimental to the inmate's rehabilitation.

"(6) The visitor is a former resident currently on parole who does not have the approval of his Parole Officer or the Warden.

"(7) The visitor is a former resident who has left by maximum expiration of sentence and does not have the prior approval of the Warden.

"(8) The visitor has previously violated institutional visiting policies.

"(9) Former employees of the Kentucky State Reformatory will not be allowed to visit inmates unless they have authorization from the Warden prior to the time of the visit.

decision whether to exclude a visitor rests with the duty officer, who is to be consulted by any staff member who "feels a visitor should not be allowed admittance." ¶ K(3), App. 134.

This particular litigation was prompted in large part by two incidents when applicants were denied the opportunity to visit an inmate at the reformatory. The mother of one inmate was denied visitation for six months because she brought to the reformatory a person who had been barred for smuggling contraband. Another inmate's mother and woman friend were denied visitation for a limited time when the inmate was found with contraband after a visit by the two women. In both instances the visitation privileges were suspended without a hearing. The inmates were not prevented from receiving other visitors.

The representatives of the *Kendrick*-inmate class filed a motion with the United States District Court for the Western District of Kentucky (the court which had issued the consent decree), claiming that the suspension of visitation privileges without a hearing in these two instances violated the decree and the Due Process Clause of the Fourteenth Amendment.

"2. A master log will be kept at the Visiting Desk of all visitors who have been denied a visit for any of the reasons listed above. A visitor who is denied a visit will not be allowed to visit an inmate for up to six (6) months following the incident. Persons who bring dangerous drugs or contraband into the institution may be denied visits indefinitely, until permission is granted by the Warden. The Duty Officer has the responsibility of denying a visit for the above reasons.

"a. The master log will be furnished to all institutions and updated as required.

"3. Any time a staff member feels a visitor should not be allowed admittance for any of the reasons above, the Shift Supervisor and the Duty Officer shall be notified. The final decision will be with the Duty Officer. All decisions will be documented. If it is felt that the individual presents a serious threat of danger to himself or others the Kentucky State Police will be advised of the situation so they may make a decision on whether their intervention is needed." Kentucky State Reformatory Procedures Memorandum, No. KSR 16–00–01 (issued and effective Sept. 30, 1985); App. 132–134.

By a memorandum dated June 26, 1986, the District Court found that the prison policies did not violate the decree, App. 147, but concluded that the language of the decree was "mandatory in character," *id.*, at 148, and that, under the standards articulated by this Court in *Hewitt* v. *Helms*, 459 U. S. 460 (1983), respondents "possess a liberty interest in open visitation." The District Court directed petitioners to develop "minimal due process procedures," including "an informal, nonadversary review in which a prisoner receives notice of and reasons for" any decision to exclude a visitor, as well as an opportunity to respond. App. 148. A formal order was issued accordingly. *Id.*, at 149.

The United States Court of Appeals for the Sixth Circuit affirmed and remanded the case. 833 F. 2d 614 (1987). Relying not only on the consent decree but also on the regulations and stated policies, the court held that the relevant language was sufficiently mandatory to create a liberty interest. The Court of Appeals found that the relevant prison policies "placed 'substantive limitations on official discretion.'" *Id.*, at 618–619, quoting *Olim* v. *Wakinekona*, 461 U. S. 238, 249 (1983). The court also found that the language of the consent decree, that "[d]efendants *shall* continue their open visiting policy" (emphasis supplied by Court of Appeals), see *Kendrick* v. *Bland*, 541 F. Supp., at 37, coupled with a provision from the policy statement that "[a]n inmate *is* allowed three (3) separate visits . . . per week" (emphasis added by Court of Appeals), Reformatory Procedures ¶ B(3), App. 108, satisfied the requirement of "mandatory language" articulated by our prior cases. See 833 F. 2d, at 618.

Because this case appeared to raise important issues relevant to general prison administration, we granted certiorari. 487 U. S. 1217 (1988).

## II

The Fourteenth Amendment reads in part: "nor shall any State deprive any person of life, liberty, or property, without

due process of law," and protects "the individual against arbitrary action of government," *Wolff* v. *McDonnell*, 418 U. S. 539, 558 (1974). We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 571 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt* v. *Helms*, 459 U. S., at 472. The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents of State Colleges* v. *Roth*, 408 U. S., at 577, and must be based on more than "a unilateral hope," *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458, 465 (1981). Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States." *Hewitt* v. *Helms*, 459 U. S., at 466.

Respondents do not argue—nor can it seriously be contended, in light of our prior cases—that an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause. We have rejected the notion that "*any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." (Emphasis in original.) *Meachum* v. *Fano*, 427 U. S. 215, 224 (1976). This is not to say that a valid conviction extinguishes every direct due process protection; "consequences visited on the prisoner that are qualitatively different from the punishment characteristically suffered by a person convicted of crime" may invoke the protections of the Due Process Clause even in the absence of a state-created right. *Vitek* v. *Jones*, 445 U. S. 480, 493 (1980) (transfer to mental hospital). However, "[a]s long as the conditions or degree of confinement

to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye* v. *Haymes*, 427 U. S. 236, 242 (1976). The denial of prison access to a particular visitor "is well within the terms of confinement ordinarily contemplated by a prison sentence," *Hewitt* v. *Helms*, 459 U. S., at 468, and therefore is not independently protected by the Due Process Clause.

We have held, however, that state law may create enforceable liberty interests in the prison setting. We have found, for example, that certain regulations granted inmates a protected interest in parole, *Board of Pardons* v. *Allen*, 482 U. S. 369 (1987); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979), in good-time credits, *Wolff* v. *McDonnell*, 418 U. S., at 556–572, in freedom from involuntary transfer to a mental hospital, *Vitek* v. *Jones*, 445 U. S., at 487–494, and in freedom from more restrictive forms of confinement within the prison, *Hewitt* v. *Helms*, *supra*. In contrast, we have found that certain state statutes and regulations did not create a protected liberty interest in transfer to another prison. *Meachum* v. *Fano*, 427 U. S., at 225 (intrastate transfer); *Olim* v. *Wakinekona*, *supra* (interstate transfer). The fact that certain state-created liberty interests have been found to be entitled to due process protection, while others have not, is not the result of this Court's judgment as to what interests are more significant than others; rather, our method of inquiry in these cases always has been to examine closely the language of the relevant statutes and regulations.[3]

<hr/>

[3] Petitioners and their *amici* urge us to adopt a rule that prison regulations, regardless of the mandatory character of their language or the extent to which they limit official discretion, "do not create an entitlement protected by the Due Process Clause when they do not affect the duration or release from confinement, or the very nature of confinement." See Brief for Petitioners 10. They argue that this bright line would allow prison officials to issue guidelines to prison staff to govern minor decisions, without thereby transforming the details of prison life into "liberty inter-

Stated simply, "a State creates a protected liberty interest by placing substantive limitations on official discretion." *Olim* v. *Wakinekona*, 461 U. S., at 249. A State may do this in a number of ways. Neither the drafting of regulations nor their interpretation can be reduced to an exact science. Our past decisions suggest, however, that the most common manner in which a State creates a liberty interest is by establishing "substantive predicates" to govern official decision-making, *Hewitt* v. *Helms*, 459 U. S., at 472, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met.

Most of our procedural due process cases in the prison context have turned on the presence or absence of language creating "substantive predicates" to guide discretion. For example, the failure of a Connecticut statute governing commutation of sentences to provide "particularized standards or criteria [to] guide the State's decisionmakers," *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S., at 467 (BRENNAN, J., concurring), defeated an inmate's claim that the State had created a liberty interest. *Id.*, at 465 (majority opinion). See also *Olim* v. *Wakinekona*, 461 U. S., at 249–250 (interstate prison transfer left to "completely unfettered" discretion of administrator); *Meachum* v. *Fano*, 427 U. S., at 228 (intrastate prison transfer at discretion of officials); *Montanye* v. *Haymes*, 427 U. S., at 243 (same). In other instances, we have found that prison regulations or statutes *do* provide decisionmaking criteria which serve to limit discretion. See, *e. g.*, *Hewitt* v. *Helms*, 459 U. S., at 472 (administrative segregation not proper absent particular substantive predicates); *Board of Pardons* v. *Allen*, 482 U. S., at 381 (parole granted unless certain standards met, even though the decision is "'necessarily subjective . . . and predictive'").

---

ests" with accompanying procedural rights. Inasmuch as a "bright line" of this kind is not necessary for a ruling in favor of petitioners, we refrain from considering it at this time. We express no view on the proposal and leave its resolution for another day.

We have also articulated a requirement, implicit in our earlier decisions, that the regulations contain "explicitly mandatory language," *i. e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest. See *Hewitt* v. *Helms*, 459 U. S., at 471–472. The regulations at issue in *Hewitt* mandated that certain procedures be followed, and "that administrative segregation will not occur absent specified substantive predicates." *Id.*, at 472. In *Board of Pardons* v. *Allen*, *supra*, the relevant statute "use[d] mandatory language ('shall') to 'creat[e] a presumption that parole release will be granted' when the designated findings are made," 482 U. S., at 377–378, quoting *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S., at 12. See also *id.*, at 11 (statute providing that board "shall order" release unless one of four specified conditions is found). In sum, the use of "explicitly mandatory language," in connection with the establishment of "specified substantive predicates" to limit discretion, forces a conclusion that the State has created a liberty interest. *Hewitt* v. *Helms*, 459 U. S., at 472.

## III

The regulations and procedures at issue in this case do provide certain "substantive predicates" to guide the decisionmaker. See nn. 1 and 2, *supra*. The state procedures provide that a visitor "may be excluded" when, *inter alia*, officials find reasonable grounds to believe that the "visitor's presence in the institution would constitute a clear and probable danger to the institution's security or interfere with [its] orderly operation." See n. 1, *supra*. Among the more specific reasons listed for denying visitation are the visitor's connection to the inmate's criminal behavior, the visitor's past disruptive behavior or refusal to submit to a search or show proper identification, and the visitor's being under the influence of alcohol or drugs. *Ibid.* The reformatory procedures are nearly identical, and include a prohibition on a

visit from a former reformatory inmate, without the prior approval of the warden. See n. 2, *supra*. These regulations and procedures contain standards to be applied by a staff member in determining whether to refer a situation to the duty officer for resolution, and require the staff member to notify the duty officer if the staff member feels that a visitor should not be allowed admittance. *Ibid*. The same "substantive predicates" undoubtedly are intended to guide the duty officer's discretion in making the ultimate decision.

The regulations at issue here, however, lack the requisite relevant mandatory language. They stop short of requiring that a particular result is to be reached upon a finding that the substantive predicates are met.[4] The Reformatory Procedures Memorandum begins with the caveat that "administrative staff reserves the right to allow or disallow visits," and goes on to note that "it is the policy" of the reformatory "to respect the right of inmates to have visits." App. 106. This language is not mandatory. Visitors *may* be excluded if they fall within one of the described categories, see n. 1, *supra*, but they need not be. Nor need visitors fall within one of the described categories in order to be excluded. The

---

[4] It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for *any* imperative that might be found. The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether an inmate may be deprived of the particular interest in question. Thus, one of the examples of mandatory language relied upon by the Court of Appeals is unavailing, that is, the statement that an inmate "is allowed three (3) separate visits in the Visiting Building per week." App. 108. This directive says nothing about whether any *particular* visitor must be admitted, and thus has no direct relevance to the decision whether to exclude a particular visitor, which is what is at issue here. Another example of irrelevant mandatory language is the following: "A visitor who is denied a visit *will not* be allowed to visit an inmate for up to six (6) months following the incident." (Emphasis added.) See n. 2, *supra*. This language refers only to the penalty to be imposed once an individual is found to be unfit to visit, and has no role to play in guiding prison officials' discretion in deciding whether to exclude a visitor in the first instance.

overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions. Or, to state it differently, the regulations are not worded in such a way that an inmate could reasonably expect to enforce them against the prison officials.[5]

Because the regulations at issue here do not establish a liberty interest entitled to the protections of the Due Process Clause, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

I concur fully in the opinion and judgment of the Court. I write separately to note that this case involves a denial of prison access to particular visitors, not a general ban on all prison visitation. Nothing in the Court's opinion forecloses the claim that a prison regulation permanently forbidding all visits to some or all prisoners implicates the protections of the Due Process Clause in a way that the precise and individualized restrictions at issue here do not.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

As a result of today's decision, correctional authorities at the Kentucky State Reformatory are free to deny prisoners visits from parents, spouses, children, clergy members, and

---

[5] The language of the consent decree, that "[d]efendants shall continue their open visiting policy," is mandatory only to the extent that it prevents the State from making its regulations more restrictive than they were at the time the decree was entered. Obviously, the promise to leave unchanged a discretionary policy does not transform that policy into a mandatory one. The District Court found that the regulations enacted after the decree was signed were no more restrictive than those already in place. App. 147. For this reason, we need make no judgment as to whether a consent decree can create a liberty interest protected by the Fourteenth Amendment. The issue was not briefed or argued by the parties or discussed below and is not necessary to our decision.

close friends for any reason whatsoever, or for no reason at all. Prisoners will not even be entitled to learn the reason, if any, why a visitor has been turned away. In my view, the exercise of such unbridled governmental power over the basic human need to see family members and friends strikes at the heart of the liberty protected by the Due Process Clause of the Fourteenth Amendment. Recognizing a liberty interest in this case would not create a right to "unfettered visitation," *ante*, at 460, but would merely afford prisoners rudimentary procedural safeguards against retaliatory or arbitrary denials of visits. Because the majority refuses to take this small step, I dissent.

## I

The majority begins its analysis by conceding, as it must under our precedents, that prisoners do not shed their constitutional rights at the prison gate, but instead retain a residuum of constitutionally protected liberty independent of any state laws or regulations. See *ante*, at 459–461.[1] In the balance of its opinion, however, the majority proceeds to prove the emptiness of this initial gesture. In concluding that prison visits implicate no retained liberty interest, the majority applies the following oft-cited test: "'As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.'" *Ante*, at 460–461, quoting *Montanye* v. *Haymes*, 427 U. S. 236, 242 (1976). On its face, the "within the sentence" test knows few rivals for vagueness and pliability, not the least because a typical

---

[1] "[I]f the inmate's protected liberty interests are no greater than the State chooses to allow, he is really little more than the slave described in the 19th century cases. I think it clear that even the inmate retains an unalienable interest in liberty—at the very minimum the right to be treated with dignity—which the Constitution may never ignore." *Meachum* v. *Fano*, 427 U. S. 215, 233 (1976) (STEVENS, J., dissenting).

prison sentence says little more than that the defendant must spend a specified period of time behind bars. As applied, this test offers prisoners scant more protection, for the Justices employing it have rarely scrutinized the actual conditions of confinement faced by the prisoners in the correctional institutions at issue. Under this approach, therefore, "a prisoner crosses into limbo when he enters into penal confinement." *Hewitt* v. *Helms*, 459 U. S. 460, 482 (1983) (STEVENS, J., dissenting). In theory he retains some minimal interest in liberty protected by the Due Process Clause, but in practice this interest crystallizes only on those infrequent occasions when a majority of the Court happens to say so.[2]

I have previously stated that, when prison authorities alter a prisoner's conditions of confinement, the relevant question should be whether the prisoner has suffered "a sufficiently 'grievous loss' to trigger the protection of due process." *Olim* v. *Wakinekona*, 461 U. S. 238, 252 (1983) (MARSHALL, J., dissenting), quoting *Vitek* v. *Jones*, 445 U. S. 480, 488 (1980); see also *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972). The answer depends not only on the nature and gravity of the change, but also on whether the prisoner has been singled out arbitrarily for disparate treatment. "For an essential attribute of the liberty protected by the Constitution is the right to the same kind of treatment as the State provides to other similarly situated persons. A convicted felon, though he is properly placed in a disfavored class, retains this essential right." *Hewitt*, *supra*, at 485–486 (STEVENS, J., dissenting) (footnote omitted); see also *Olim*, *supra*, at 252 (MARSHALL, J., dissenting). Put another way, the retained liberty interest protected by the Constitution encompasses the right to be free from arbitrary

---

[2] The majority's refusal to take seriously the prisoners' retained liberty claim is demonstrated by its unwillingness to acknowledge this claim when, at the very outset of its opinion, it frames the issue in this case as one solely involving state-created rights. See *ante,* at 455.

governmental action affecting significant personal interests. See *Wolff* v. *McDonnell*, 418 U. S. 539, 571–572, n. 19 (1974).

Prison visits have long been recognized as critically important to inmates as well as to the communities to which the inmates ultimately will return.[3] Without visits, a prisoner "may be entirely cut off from his only contacts with the outside world." *Olim, supra*, at 253 (MARSHALL, J., dissenting). Confinement without visitation

> "brings alienation and the longer the confinement the greater the alienation. There is little, if any, disagreement that the opportunity to be visited by friends and relatives is more beneficial to the confined person than any other form of communication.
>
> "Ample visitation rights are also important for the family and friends of the confined person. . . . Preservation of the family unit is important to the reintegration of the confined person and decreases the possibility of recidivism upon release. . . . [V]isitation has demonstrated positive effects on a confined person's ability to adjust to life while confined as well as his ability to adjust to life upon release . . . ." National Conference of Commissioners on Uniform State Laws, Model Sentencing and Corrections Act § 4–115, Comment (1979) (hereinafter NCCUSL) (citations omitted).[4]

---

[3] Cf. Leverson, Constitutional Limits on the Power to Restrict Access to Prisons: An Historical Re-Examination, 18 Harv. Civ. Rights-Civ. Lib. L. Rev. 409, 413–415 (1983) (describing widespread visitation practices in early English and American prisons).

[4] See also, *e. g.*, National Sheriffs' Association, Inmates' Legal Rights 67 (rev. ed. 1987) (hereinafter NSA) (visits "with family, friends and others [are] important if the inmate is to retain his ties to the community and his knowledge of what the free society is like"); U. S. Dept. of Justice, Federal Standards for Prisons and Jails, Standard 12.12, Discussion (1980) (hereinafter DOJ) ("Visiting is an important element in maintaining inmates' contact with outside society"); ABA Standards for Criminal Justice 23–6.2, Commentary (2d ed. 1980) (hereinafter ABA) ("Because almost all inmates ultimately will be returned to the community at the expiration of their

Consistent with this view, numerous governmental and private organizations which deal closely with correctional institutions have promulgated standards designed "to maximize visiting opportunities for inmates." U. S. Dept. of Justice, Federal Standards for Prisons and Jails, Standard 12.12 (1980).[5] Although the details vary, the standards uniformly provide that visitors should not be barred except for good cause shown. Kentucky itself, in its statewide Corrections Policies and Procedures (Commonwealth Procedures), recognizes that visits permit reformatory inmates such as Kenneth Bobbitt and Kevin Black "to maintain morale and contact with the community," and thus "are important to the inmate and his success within the community upon release." App. 98.

The majority intimates that the actions taken against prisoners Bobbitt and Black were based on good cause, see *ante*, at 458, but the very essence of these prisoners' factual allegations is that no such cause existed. *Id.*, at 57–58, 61, 66–68, 70–71. If Bobbitt and Black are correct, they may well have suffered a "grievous loss" by being singled out arbitrarily for unjustifiably harsh treatment. No evidence whatsoever indicates that visitors to the reformatory have ever been

---

terms, it is important to preserve, wherever possible, family and community ties"); National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 2.17, Commentary (1973) (hereinafter NAC) ("Strained ties with family and friends increase the difficulty of making the eventual transition back to the community. The critical value for offenders of a program of visiting with relatives and friends long has been recognized"); cf. *Thornburgh* v. *Abbott*, *ante*, at 407 ("Access [to prisons] is essential . . . to families and friends of prisoners who seek to sustain relationships with them . . ."); *Pell* v. *Procunier*, 417 U. S. 817, 825 (1974) (noting prison director's determination that personal visits "aid in the rehabilitation of the inmate while not compromising the other legitimate objectives of the corrections system").

[5] See also, *e. g.*, NSA, at 67; DOJ, Standards 12.12–12.15; NCCUSL, §§ 4–114, 4–118; ABA, Standard 23–6.2; American Correctional Assn., Standards for Adult Correctional Institutions, Standards 2–4380 to 2–4386 (2d ed. 1981); NAC, Standard 2.17.

barred for any reason except those enumerated as legitimate in the Commonwealth Procedures and the institution-specific Reformatory Procedures Memorandum (Reformatory Memorandum). See *ante*, at 456–458, nn. 1, 2. It is nowhere suggested, furthermore, that these prisoners' sentences contemplated denials of visits for nonenumerated reasons, or that such denials are "'well within the terms of confinement ordinarily contemplated'" in the reformatory. *Ante*, at 461, quoting *Hewitt*, 459 U. S., at 468. Under the majority's disposition, neither prisoner will ever have a right to contest the prison authorities' account. One need hardly be cynical about prison administrators to recognize that the distinct possibility of retaliatory or otherwise groundless deprivations of visits calls for a modicum of procedural protections to guard against such behavior.

## II

Even if I believed that visit denials did not implicate a prisoner's retained liberty interest, I would nonetheless find that a liberty interest has been "created" by the Commonwealth's visitation regulations and policies.[6] As the majority notes, "'a State creates a protected liberty interest by placing substantive limitations on official discretion.'" *Ante*, at 462, quoting *Olim*, 461 U. S., at 249. I fully agree with the majority that "[t]he regulations and procedures at issue in this case do provide certain 'substantive predicates' to guide the decisionmaker." *Ante*, at 463. But I cannot agree that Kentucky's prison regulations do not create a liberty interest because they "lack the requisite relevant mandatory language." *Ante*, at 464.

[6] Although the Court's past decisions establish that a liberty interest may be "created" by state regulations and policies, I have taken a somewhat different view of the relationship between such regulations and policies and the Due Process Clause. See *Olim* v. *Wakinekona*, 461 U. S. 238, 255, n. 6 (1983) (MARSHALL, J., dissenting), quoting *Hewitt* v. *Helms*, 459 U. S. 460, 488 (1983) (STEVENS, J., dissenting) ("Prison regulations 'provide evidentiary support for the conclusion that the [adverse action taken against a prisoner] affects a constitutionally protected interest in liberty,' but they 'do not *create* that interest'") (emphasis in *Hewitt*).

As an initial matter, I fail to see why mandatory language always is an essential element of a state-created liberty interest. Once it is clear that a State has imposed substantive criteria in statutes or regulations to guide or limit official discretion, there is no reason to assume—as the majority does—that officials applying the statutes or regulations are likely to ignore the criteria if there is not some undefined quantity of the words "shall" or "must." Drafters of statutes or regulations do not ordinarily view the criteria they establish as mere surplusage. Absent concrete evidence that state officials routinely ignore substantive criteria set forth in statutes or regulations (and there is no such evidence here), it is only proper to assume that the criteria are regularly employed *in practice*, thereby creating legitimate expectations worthy of protection by the Due Process Clause. Common sense suggests that expectations stem from practice as well as from the language of statutes or regulations. *Vitek* v. *Jones*, 445 U. S., at 489 (approving lower courts' reliance on "objective expectation, firmly fixed in state law and official Penal Complex practice").[7] This point escapes the majority, which apparently harbors the "unrealistic [belief] that variations such as the use of 'may' rather than 'shall' could negate the expectations derived from experience with a [prison] system and . . . enumerated criteria . . . ." *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 29–30, n. 9 (1979) (MARSHALL, J., dissenting) (citation omitted).

---

[7] See also, *e. g.*, *Dace* v. *Mickelson*, 816 F. 2d 1277, 1279 (CA8 1987) (en banc) (a prisoner's "expectancy" is based on "a review of a state rule, regulation, or practice"); *Whitehorn* v. *Harrelson*, 758 F. 2d 1416, 1422 (CA11 1985) ("The court must examine the . . . practices of the prison officials in administering the program to determine whether [it] . . . place[s] a restriction on the prison official's discretion . . ."); *Parker* v. *Cook*, 642 F. 2d 865, 876 (CA5 Unit B 1981) ("[T]he interaction between written *regulations* and actual *practices* often produces results not apparent by a mere examination of the regulations"); cf. *Perry* v. *Sindermann*, 408 U. S. 593, 602 (1972) ("[T]here may be an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure").

Even if I thought it proper to rely on the presence or absence of mandatory language, I would still disagree with the majority's determination that the regulations here lack such language.[8] The majority relies primarily on a statement in the Reformatory Memorandum that "administrative staff reserves the right to allow or disallow visits." It is important, however, to put this "caveat," *ante*, at 464, in proper context. The Reformatory Memorandum's section on visitation occupies 33 pages of the joint appendix. The caveat appears just once in a general, introductory paragraph which also includes the statement that "it *is* the policy of the Kentucky State Reformatory to respect the right of inmates to have visits." App. 106 (emphasis added). Over the next 20 pages, the Reformatory Memorandum lays out in great detail the mandatory "procedures to be *enforced* in regard to *all* types of visits." *Ibid.* (emphasis added).[9] It states, for

---

[8] The majority does not state clearly whether its rationale applies solely to prisoners in the reformatory, or to prisoners in all of the Commonwealth's correctional institutions. I read the majority opinion as limited to prisoners in the reformatory for several reasons. First, although the majority points to language both in the statewide Commonwealth Procedures and the institution-specific Reformatory Memorandum in first determining that there are sufficient substantive predicates cabining official discretion, *ante*, at 463–464, the majority relies exclusively on statements in the Reformatory Memorandum in finding insufficient mandatory language to create a liberty interest. *Ante*, at 464–465. Second, Bobbitt and Black—the only prisoners subject to visitation denials in this case—were both incarcerated in the reformatory at the time of the incidents giving rise to this litigation. Third, the Reformatory Memorandum is the only institution-specific set of rules before the Court. Tr. of Oral Arg. 28. It is quite possible that other correctional facilities in the Commonwealth have promulgated rules which create a liberty interest even under the majority's linguistic approach. As the Court of Appeals for the Sixth Circuit noted below, "it is unclear from the record what set of regulations governs visits in other parts of the Kentucky System." 833 F. 2d 614, 619 (1987).

[9] These procedures pertain to such matters as the days, lengths, times, and places for visits; the dress code for prisoners and visitors; the scope of permissible searches of prisoners and visitors; the type of contact permitted between prisoners and visitors; and the special rules for night visits

example, that "[v]isits *will* be conducted seven (7) days a week," *id.*, at 107 (emphasis added); that "[a]n inmate *is* allowed three (3) separate visits . . . per week," *id.*, at 108 (emphasis added); that "[t]here *will* be *no* visit list maintained which specifies who may visit an inmate," *ibid.* (emphasis added); that "[a]n inmate *is* allowed to have . . . three (3) adult visitors . . . per visit," *id.*, at 108–109 (emphasis added); that visits "*will* be one and one-half hours," *id.*, at 109 (emphasis added); and that "[e]ach inmate *will* be allowed one (1) outdoor visit per week," *id.*, at 125 (emphasis added).

Only then does the Reformatory Memorandum enumerate the very specific reasons for which a visitor may be excluded. *Id.*, at 132–134, quoted *ante*, at 457–458, n. 2. The duty officer does not have unfettered discretion with respect to visitors. Rather, he "has the responsibility of denying a visit *for the above [enumerated] reasons.*" App. 134 (emphasis added). When a visit is denied, the reasons "*will* be documented." *Ibid.* (emphasis added). Presumably this means that the duty officer must keep a record of which of "the above reasons" caused him to exclude the visitor. The Reformatory Memorandum also expressly references the American Correctional Association's visitation standards, which provide that "visits may be limited *only* by the institution's schedule, space, and personnel constraints, or when there are substantial reasons to justify such limitations." American Correctional Association, Standards for Adult Correctional Institutions, Standard 2–4381 (2d ed. 1981) (emphasis added), cited at App. 106. Nothing in these standards even remotely contemplates the arbitrary exclusion of visitors.

When these mandatory commands are read in conjunction with the detailed rules set forth in the Commonwealth Procedures,[10] it is inconceivable that prisoners in the reformatory

---

and outdoor visits, as well as for legal, clergy, and hospital visits. App. 106–132.

[10] Although the Commonwealth Procedures are somewhat less elaborate—because the individual correctional institutions are charged with

would not "reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions." *Ante*, at 465. The majority inexplicably ignores nearly all of these commands, despite claiming to have considered the "overall effect of the regulations," *ibid.*, and despite the Commonwealth's striking concession that the regulations "repeatedly use 'will', 'shall', and similar directive or mandatory language" in an effort "to advise inmates and potential visitors what is *expected*." Brief for Petitioners 13, 30 (emphasis added); see also Tr. of Oral Arg. 5–6 ("[O]ur procedures are very limiting in the discretion of the officials").[11] In light of these mandatory commands, the caveat, as well as any other language that could be taken to suggest that visitors need not "fall within one of the described categories in order to be excluded," *ante*, at 464, amount to nothing more than mere boilerplate. The Court should reject the view that "state laws which impose substantive limitations and elaborate procedural requirements on official conduct create no liberty interest solely because there remains the possibility that an official will act in an arbitrary manner at the end of the process." *Olim*, 461 U. S., at 258–259 (MARSHALL, J., dissenting) (discussing holding in *Hewitt*); see also 461 U. S., at 259, n. 13 (discussing similar

---

supplementing these statewide rules with ones designed to fit their own institutions—there is no shortage of mandatory language. Visits "*are* to be promoted and facilitated by each institution," *id.*, at 98 (emphasis added); "[a]t a minimum," weekend and holiday visiting "*shall* [be] permi[tted]," *id.*, at 99 (emphasis added); the individual institutions "*must* allow each inmate the opportunity to visit a minimum of eight hours per month," *ibid.* (emphasis added); and "[u]nder normal conditions, any [regular visitor] *can* visit *unless* visits could reasonably create a threat to the security and order of the institution," *id.*, at 100 (emphasis added).

[11] It is no answer to say that most of the mandatory commands are irrelevant because the decision "to exclude a particular visitor" is the only issue in this case. *Ante*, at 464, n. 4. After today's decision, there are no constraints whatsoever on the reformatory's ability to exclude *all* of an inmate's visitors simply by invoking its unreviewable discretion whenever a person seeks to visit the inmate.

holding in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979); cf. *Brennan* v. *Cunningham*, 813 F. 2d 1, 8 (CA1 1987).

Finally, the majority's reliance on the fact that both the Commonwealth Procedures and the Reformatory Memorandum provide that a visitor "may" be excluded if he falls within one of the enumerated categories, *ante*, at 464, is misplaced. The word "may" in this context simply means that prison authorities possess the discretion to allow visits from persons who fall within one of the enumerated categories. Surely this possibility cannot defeat a prisoner's legitimate expectation that visitors will be denied *only* when they fall within one of those categories. In *Hewitt*, regulations regarding administrative segregation were deemed to have created a liberty interest even though they stated that a prisoner "may" be placed in segregation on the occurrence of specified substantive predicates. See 459 U. S., at 470, n. 6. Likewise, in *Vitek*, a prisoner had a state-created liberty interest in not being transferred to a mental hospital even though the applicable state statute provided that the director of correctional services "may" transfer a prisoner to such a hospital after certain medical findings are made. See 445 U. S., at 483, n. 1. If the use of the word "may" could not defeat a liberty interest in *Hewitt* or *Vitek*, I fail to see how it could do so here.

## III

The prisoners in this case do not seek a right to unfettered visitation. All they ask is that the Court recognize that visitation is sufficiently important to warrant procedural protections to ensure that visitors are not arbitrarily denied. The protections need not be extensive, but simply commensurate with the special "needs and exigencies of the institutional environment." *Wolff*, 418 U. S., at 555. In making the threshold determination that the denial of visits can never implicate a prisoner's liberty interest, the majority thus establishes that when visitors are turned away, *no* process, not

even notice, is constitutionally due. I cannot accept such a parsimonious reading of the Due Process Clause, and therefore dissent.