Kurt Clark HINES, petitioner,
Appellant,

v.

Joan FABIAN, Commissioner
of Corrections, et al.,
Respondents.

No. A08–1241.

Court of Appeals of Minnesota.

May 5, 2009.

Bradford Colbert, Legal Assistance to Minnesota Prisoners, St. Paul, for appellant.

Lori Swanson, Attorney General, Margaret Jacot, Assistant Attorney General, St. Paul, for respondents.

Considered and decided by LARKIN, Presiding Judge; MINGE, Judge; and STAUBER, Judge.

## OPINION

LARKIN, Judge.

Appellant challenges the district court's award of summary judgment in respondents' favor, arguing that the district court erred by concluding that appellant did not have a protected liberty interest in remaining in the Challenge Incarceration Program and was not entitled to procedural due process before termination from the program. We affirm.

## FACTS

The Challenge Incarceration Program (CIP) was created by the legislature in 1992. *See* 1992 Minn. Laws ch. 571, § 5, at 17. The Minnesota Commissioner of Corrections (commissioner) has discretion to "select offenders who meet the [statuto-ry] eligibility requirements ... to participate in a[CIP] ... for all or part of the offender's sentence if the offender agrees to participate in the program and signs a written contract with the commissioner agreeing to comply with the program's requirements." Minn.Stat. § 244.17, subd. 1 (2006); *see also* DOC Division Directive 204.060 (2006).

The CIP consists of three phases. Phase I lasts at least six months, during which the offender is confined in a state correctional facility and must successfully participate in intensive treatment, education, and work programs. Minn.Stat. § 244.172, subd. 1 (2006). Phase II lasts at least six months and consists of an intensive supervision and surveillance program. *Id.*, subd. 2 (2006).

Phase III continues until the commissioner determines that the offender has successfully completed the program or until the offender's sentence, minus jail credit, expires, whichever comes first. If an offender successfully completes phase III of the challenge incarceration program before the offender's sentence expires, the offender shall be placed on supervised release for the remainder of the sentence.

*Id.*, subd. 3 (2006).

When an inmate applies for admission to the CIP, the CIP case manager reviews the offender's file for eligibility under statutory criteria and Minnesota Department of Corrections (DOC) discretionary criteria. *See* Minn.Stat. § 244.17, subd. 2 (2006); DOC Div. Directive 204.060 (describing discretionary criteria). Under the DOC discretionary criteria an inmate may be denied admission based on "[d]ocumented aggravated offense characteristics" and "[v]ictim impact/community concerns." DOC Div. Directive 204.060. If an inmate is determined to be eligible for the program, the CIP case manager provides the

inmate with the CIP Phase I Program Agreement, which the offender must sign. *See* Minn.Stat. § 244.17, subd. 1 (requiring that offender sign a written contract).

After admission, the offender can be terminated from the program by revocation or rescission. Revocation occurs when an inmate fails to adhere to the CIP Phase I Program Agreement. DOC Instruction 204.060WR; *see also* Minn.Stat. § 244.171, subd. 4 (2006) (stating, "[t]he commissioner shall remove an offender from" CIP for various prohibited acts and providing that removal shall be governed by rules adopted by the commissioner). The inmate is provided a hearing prior to revocation. DOC Div. Directive 204.060. Rescission may occur when an offender no longer meets the statutory or departmental criteria allowing participation in the CIP due to medical, legal, or administrative reasons. DOC Instruction 204.060WR. An administrative rescission occurs when continuing an inmate in the CIP would be contrary to sound correctional practice, based on a non-exhaustive list of reasons. *Id.* In contrast to revocation, the inmate is not provided a hearing prior to rescission. *Id.*

In July 2005, appellant Kurt Clark Hines was sentenced to serve 86 months in the custody of the commissioner following his conviction of first-degree possession of a controlled substance. In September 2005, Hines applied for admission to the CIP and to the Conditional Release Program (CRP). Like the CIP, the CRP allows for inmates to be released from confinement early if they comply with certain conditions. DOC staff determined that Hines met the initial admission criteria for CRP and sent letters to the county attorney who prosecuted Hines and the district court judge who sentenced Hines, as required by statute, on October 4 and 5, 2005. *See* Minn.Stat. § 244.055, subd. 10 (2006) (requiring notification to the prose-

cuting authority and sentencing court prior to admitting an offender into the CRP). On October 11, 2005, the DOC received letters from the county attorney and district court judge opposing any early release for Hines. On November 6, 2005, the DOC received a letter from the Fairmont Police Chief that expressed the police department's opposition to Hines's early release. The letters were placed in Hines's base file. Ultimately, Hines was denied entry into the CRP.

Hines's CIP application was submitted on September 2, 2005. CIP staff reviewed Hines's file and approved his participation in the CIP on September 8, 2005. On February 6, 2006, Hines signed the CIP Phase I Agreement. The agreement stated in part:

> I further understand that I am being granted the CIP status based upon information available at the time of my approval. If information becomes available at any time during my participation in the CIP, which would have made me ineligible, my CIP status may be terminated and I may be returned to a secure facility.

Hines began the CIP on May 9, 2006. In August 2006, the CIP staff reviewed Hines's base file and for the first time saw the letters from the prosecutor, district court judge, and chief of police. Because the letters arrived after Hines's acceptance into the program, they were not considered in conjunction with Hines's application to the CIP. Because the letters expressed community concerns and aggravating-offense characteristics, the CIP staff sent Hines's file to the commissioner for review. The commissioner reviewed Hines's case and concluded that there were community concerns and that the case involved aggravating-offense characteristics given the amount of narcotics and money seized. Based on these conclu-

sions, the commissioner terminated Hines from the CIP on August 30, 2006 and treated the termination as an administrative rescission.

Hines filed a grievance in September 2006, which the warden denied based on a determination that aggravating-offense characteristics made Hines an inappropriate candidate for the CIP. Hines appealed the grievance decision to the assistant commissioner, who denied his appeal. Hines then commenced a lawsuit against the commissioner, claiming that he was entitled to procedural due process prior to his termination from the CIP. Hines claimed that he had a protected liberty interest in remaining in the CIP because of the early release he could have received by successfully completing the CIP.

The commissioner moved for summary judgment, arguing that Hines did not have a protected liberty interest in participating in the CIP and that the DOC was not required to provide Hines with procedural due process prior to termination. The district court concluded that there was no material dispute of fact regarding whether Hines was rescinded from the CIP. The district court also concluded that Hines did not have a protected liberty interest in remaining in the CIP and granted the commissioner's motion for summary judgment. This appeal follows.

## ISSUE

Did the district court err by concluding that Hines did not have a protected liberty interest in remaining in the Challenge Incarceration Program?

## ANALYSIS

On appeal from summary judgment, an appellate court determines (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *Olmanson v. LeSueur County,* 693 N.W.2d 876, 879 (Minn.2005). When summary judgment is granted based on application of the law to undisputed facts, as is the case here, the result is a legal conclusion that we review de novo. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn. 1998); *see also Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758,* 594 N.W.2d 216, 220 (Minn.App.1999) (stating that whether procedural due process is required in a particular case is a question of law, which we review de novo), *review denied* (Minn. July 28, 1999).

■ Both the United States Constitution and the Minnesota Constitution provide that no person shall be deprived of "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. While a prison inmate does not enjoy the full range of rights and privileges available to ordinary citizens, he does not surrender all of his constitutional rights upon incarceration. *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Prison inmates are entitled to due-process protection, and prison officials "must provide inmates with an appropriate level of due process before they are deprived of a protected liberty interest." *Carrillo v. Fabian,* 701 N.W.2d 763, 768 (Minn.2005).

■ When engaging in a due-process analysis, we must first determine whether the complainant has a protected liberty or property interest with which the state has interfered. *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). "Without a protected interest, the government has no constitutional obligation to provide due process." *Phillips v. State,* 725 N.W.2d 778, 782–83 (Minn.App.2007), *review denied* (Minn. Mar. 28, 2007). If we find a deprivation of such an interest, we must then determine whether the procedures

attendant upon that deprivation were constitutionally sufficient. *See Thompson,* 490 U.S. at 460, 109 S.Ct. at 1908.

■ In determining whether Hines had a liberty interest in remaining in the CIP, we look to the nature of the interest to determine if it is within the scope of the Fourteenth Amendment's protection of liberty and property. *Carrillo,* 701 N.W.2d at 768 (citing *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972)) (other citation omitted). Although the range of liberty interests protected by procedural due process is broad, it "is not infinite." *Roth,* 408 U.S. at 570, 92 S.Ct. at 2705. "A constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation." *Carrillo,* 701 N.W.2d at 768 (citing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979)). Liberty interests may arise from two sources—the Due Process Clause itself and the laws of the states. *State ex rel. McMaster v. Young,* 476 N.W.2d 670, 672 (Minn.App.1991) (quotation omitted), *review denied* (Minn. Dec. 13, 1991).

Hines argues that he had a protected liberty interest in remaining in the CIP because Minn.Stat. § 244.172, subd. 3, requires the commissioner to place an offender who successfully completes the CIP on supervised release. Hines argues that by requiring the commissioner to release an inmate upon successful completion of the CIP, the legislature created a liberty interest in remaining in the CIP after admission to the program. Hines cites *Carrillo* in support of his argument. In *Carrillo,* the Minnesota Supreme Court held that an inmate has a protected liberty interest in his supervised-release date and that delay of a supervised-release date "inevitably affects" the length of the inmate's

imprisonment and triggers a right to procedural due process. 701 N.W.2d at 771–73. Hines contends that his case is analogous to *Carrillo* because his termination from the CIP affects the length of his imprisonment. Hines argues that had he been allowed to successfully complete the CIP, he would have been eligible for an earlier supervised-release date.

While Minn.Stat. § 244.172, subd. 3, requires the commissioner to place an offender who successfully completes the CIP on supervised release, the commissioner's initial decision regarding an inmate's admission into the CIP is entirely discretionary. The commissioner has discretion to deny admission to the CIP even if an offender meets all admission criteria. *See* Minn.Stat. § 244.17, subd. 1 (stating that the commissioner "may select offenders who meet the [statutory] eligibility requirements ... to participate in a[CIP].") And the commissioner's eligibility determination is based on discretionary criteria. DOC Div. Directive 204.060 (stating the discretionary criteria include: prior treatment program failures, correctional facility adjustment and discipline record, supervision failures, criminal history, documented aggravated-offense characteristics, gang affiliation or involvement, victim impact or community concern, upward durational departures, residential ties to the state, mental health status, and health and fitness status). We are not persuaded that Hines can claim a protected liberty interest based on a statutory mandate that applies to an inmate who successfully completes the CIP if Hines does not satisfy the discretionary admission criteria necessary to participate in the program.

In addition, the possibility of early release that results from participation in the CIP is not analogous to the mandated supervised-release date that was at issue in *Carrillo.* The *Carrillo* holding was

based on the presumptions that underlie Minnesota's sentencing scheme. 701 N.W.2d at 772–73. The supreme court noted that "under Minnesota's current sentencing scheme, there is a presumption from the moment that a court imposes and explains the sentence that the inmate will be released from prison on a certain date." *Id.* at 772. In contrast to a supervised-release date set at sentencing, the mere possibility of an accelerated supervised-release date resulting from participation in the CIP is not guaranteed; it is entirely contingent upon successful completion of the CIP. Minn.Stat. § 244.172, subd. 3. Determination of whether an offender has completed the CIP is left to the discretion of the commissioner. *Id.*, subds. 1–3. We note that none of the phases of the CIP has a fixed duration. *Id.* And the statute anticipates that an offender may reach the supervised-release date set at sentencing before the offender completes Phase III of the CIP. *Id.*, subd. 3.

Moreover, the CIP is a rehabilitative program. The program is meant to "treat offenders" and "to prepare the offender for successful reintegration into society" by instilling "personal discipline" and "physical and mental well-being," helping the offender develop "skills designed to teach the offender how to reduce and cope with stress," providing the offender with "basic educational skills ... and ... vocational training," and promoting "the offender's self-worth and the offender's acceptance of responsibility for the consequences of the offender's own decisions." Minn.Stat. § 244.171, subds. 1, 2 (2006). This court has previously held that inmates have no protected liberty interest in rehabilitative programming within the prison system. *State ex rel. McMaster*, 476 N.W.2d at 674 (holding that inmates have no liberty interests in accessing rehabilitative programs in the Minnesota prison system); *see also State ex rel. Guth v. Fabian*, 716 N.W.2d 23, 28

(Minn.App.2006) (noting that because vocational school and work release are rehabilitative programs, appellant had no protected liberty interest in participating in these programs), *review denied* (Minn. Aug. 15, 2006).

Hines concedes that he had no right to be admitted to the CIP. Instead, Hines contends that once he was admitted into the program, a protected liberty interest in remaining in the program arose. Hines argues that he is similarly situated to an inmate who has been granted parole status, noting that while an inmate does not have a liberty interest in being paroled, an inmate has a liberty interest in remaining on parole. *Compare Greenholtz*, 442 U.S. at 11, 99 S.Ct. at 2105 (stating that offenders do not have a liberty interest in parole) *with Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972) (holding that offenders have a liberty interest in remaining on parole). We disagree.

The circumstances of an inmate who has been admitted to the CIP are not analogous to the circumstances of a parolee. "[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Morrissey*, 408 U.S. at 482, 92 S.Ct. at 2601. Unlike a parolee, a Phase I CIP participant remains in the physical custody of the commissioner and does not enjoy core values of unqualified liberty.

Under the standard set forth in *Carrillo*, we must ultimately focus on the nature of the deprivation and whether the deprivation " 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' " in order to determine whether a protected liberty interest exists. *Carrillo*, 701 N.W.2d at 770 (quoting *Sandin v. Conner*, 515 U.S.

472, 484, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995)). Deprivation of the ability to remain in the CIP does not represent a significant departure from the basic conditions of an inmate's sentence. Hines's termination from Phase I of the CIP did not result in any change in his custody status. *See* Minn.Stat. § 244.172, subd. 1 (requiring that offenders in Phase I of the CIP remain "confined in a state correctional facility"). And termination from the CIP did not change Hines's sentence. He still enjoys the expectation of the supervised-release date that was established at the time of sentencing. Minn.Stat. § 244.171, subd. 4. Termination from the CIP simply deprives Hines of the opportunity to earn an earlier release date. But given the commissioner's discretion to deny Hines admission to the program, and the indeterminate length of the program, this opportunity is not an entitlement and does not give rise to a protected liberty interest. *See Carrillo*, 701 N.W.2d at 768 ("A constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation.") (citing *Greenholtz*, 442 U.S. at 7, 99 S.Ct. at 2103–04). We conclude that Hines's termination from the CIP does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life such that Hines has a protected liberty interest in remaining in the CIP.

Finally, Hines argues that for due-process purposes, it does not matter whether an inmate is "revoked" or "rescinded" from the CIP and that an inmate's termination from the CIP results in deprivation of a protected liberty interest regardless of the label applied to the termination. But Hines also asserts, arguendo, that if there is a distinction that impacts the analysis, a genuine issue of material fact exists regarding whether Hines met the criteria for rescission.

There are no genuine issues of material fact if the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quotation omitted). There are no genuine issues of material fact regarding whether Hines was rescinded from the CIP. The record indicates that Hines was administratively terminated from the CIP because he did not satisfy the DOC's discretionary admission criteria given the aggravated characteristics of Hines's offense and the expressed community concerns. *See* DOC Div. Directive 204.060 (outlining the discretionary admissions criteria). Hines did not present any evidence that he was revoked from the CIP for failing to adhere to the CIP Phase I Program Agreement and therefore failed to raise a genuine issue of material fact regarding whether he was rescinded from the CIP.

Instead, Hines argues that there is a genuine issue of material fact regarding whether Hines did in fact meet the criteria for rescission. Hines does not dispute that the DOC treated his termination from the CIP as a "rescission," and Hines does not dispute the existence of aggravating-offense characteristics or letters expressing community concerns. Rather, Hines challenges the commissioner's interpretation and application of DOC rescission criteria. Hines specifically argues that the regulations governing administrative rescission from the CIP do not contemplate community concerns as a basis for rescission. But this argument does not raise a question of fact. Moreover, the argument is not persuasive. An administrative rescission may occur "when continuing the offender in the CIP would be contrary to sound correctional practice." DOC Instruction 204.060WR. While aggravated offense characteristics and community concerns are not listed as possible reasons for rescinding CIP acceptance as contrary to

sound correctional practice, the list of enumerated reasons is not exhaustive. *Id.* ("Possible reason[s] for rescinding CIP status are, but not limited to: jail stays, hospital stays, administrative segregation stays, vacated sentence, sentence reduction, or incompatibility issue and/or the offender is unable to participate in the CIP for longer than five calendar days."). And courts give deference to an administrative agency's interpretation of its own policy. *Risdall v. Brown–Wilbert, Inc.,* 753 N.W.2d 723, 733 (Minn.2008) (stating, "[w]hen an agency's regulation is ambiguous we will give deference to the agency's interpretation and will generally uphold that interpretation if it is reasonable" (quotation omitted)).

## DECISION

Because appellant did not have a protected liberty interest in remaining in the Challenge Incarceration Program, he was not entitled to procedural due process before termination from the program. We affirm the district court's award of summary judgment in respondents' favor.

**Affirmed.**