**John Wesley STEWART,
Plaintiff–Appellant,**

v.

**Randy BAILEY; Larry Huffman; Cindy S. Staton; Other John Does; Jerry P. Mitchell, Defendants–Appellees.**

**No. 92–6911.**

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1993.

Decided Sept. 29, 1993.

---

Mark Mendelsohn, Third–Year Law Student, Harold J. Krent, Professor, Post–Conviction Assistance Project, University of Virginia School of Law, Charlottesville, VA, argued, for plaintiff-appellant.

Pamela Sargent, Asst. Atty. Gen., Richmond, VA, argued (Melissa Warner Scoggins, Gentry, Locke, Rakes & Moore, Roanoke, VA, on brief), for defendants-appellees.

## OPINION

ERVIN, Chief Judge:

John Wesley Stewart, a Virginia prison inmate, brought this action pursuant to 42 U.S.C. § 1983 after prison officials permitted a sheriff's deputy to transport him to West Virginia on the authority of a writ of habeas corpus *ad prosequendum* issued by a West Virginia state court. Stewart claimed that the prison officials' failure to abide by Virginia's established statutory procedures for transferring prisoners into the custody of other jurisdictions for trial deprived him of due process of law in violation of the Fourteenth Amendment. The district court granted summary judgment and dismissed Stewart's action, holding as a matter of law that his complaint had failed to set forth a clearly established constitutional violation of which a reasonable person would have known, and that the responsible officials were therefore entitled to assert the defense of qualified immunity.

Because we conclude that the state statutes invoked by Stewart either do not embrace writs of habeas corpus *ad prosequendum* or do not establish the Fourteenth Amendment liberty interests he seeks to vindicate, we affirm the district court's grant of summary judgment and dismissal of his claims.

## I

In 1990 John Wesley Stewart was incarcerated in the Augusta Correctional Center in Craigsville, Virginia. On August 23, 1990 a Raleigh County, West Virginia prosecuting attorney moved the Circuit Court of Raleigh County for an order requesting that Stewart be transported from the Augusta Correctional Center to Raleigh County, where he was scheduled to be tried on criminal charges the following month. Four days later a Raleigh County Circuit Court judge granted the prosecutor's motion and issued the requested order, which bade the Raleigh County Sheriff's Department to transport Stewart to West Virginia on September 6, 1990. The order provided that, upon conclusion of the proceedings against him in Raleigh County, Stewart would be returned to the Augusta Correctional Center by the Raleigh County Sheriff's Department.

On September 6, 1990, at 5:30 a.m., a Raleigh County sheriff's deputy appeared at the Augusta Correctional Center and produced the Raleigh County Circuit Court order requesting Stewart's release. Upon receiving the order, Augusta Correctional Center officials called the prison's records custodian, Cindy S. Staton, and requested authorization to release Stewart into the West Virginia officer's custody. Staton responded that Stewart could be released "if the papers appeared to be in order."

When Staton arrived at the prison later that morning, she discovered that the Raleigh County Circuit Court's order had not been presented to the Governor of Virginia for approval before Stewart's release into West Virginia's custody. Staton promptly informed the Raleigh County Sheriff's Department of the error. She stated that Stewart would have to be returned to the Augusta Correctional Center because the paperwork necessary for approving his release had not been completed.

After reaching Beckley, West Virginia, Stewart was held in the Raleigh County jail for a brief period pending the calling of his case in the Raleigh County Circuit Court. When his case came on for trial, Stewart was convicted of grand larceny and sentenced to ten years' imprisonment, the sentence to run concurrently with his Virginia sentence. On September 7, 1990, the following day, Raleigh County Sheriff's Department officials returned Stewart to the Augusta Correctional Center.

Eleven months later, on August 8, 1991, Stewart filed the instant three-count action

pursuant to 42 U.S.C. § 1983, contending that authorities at the Augusta Correctional Center (the "Virginia defendants") and employees of the Raleigh County Sheriff's Department (the "West Virginia defendants") violated rights secured him by the Due Process and Equal Protection Clauses of the Fourteenth Amendment (1) by requesting and allowing his release without affording him the right to seek the Governor of Virginia's disapproval of the transfer of custody, *see* Va.Code Ann. § 53.1–208 (Michie 1991 & Supp.1993); (2) by failing to conduct an extradition proceeding pursuant to Virginia's version of the Uniform Criminal Extradition Act, *see* Va.Code Ann. §§ 19.2–85 to –118 (Michie 1990 & Supp.1993), before releasing him into the custody of West Virginia authorities; and (3) by failing to comply with the procedures prescribed in Virginia's version of the Interstate Agreement on Detainers, *see* Va.Code Ann. §§ 53.1–210 to –215 (Michie 1991 & Supp.1993), for transferring a state prisoner to another jurisdiction for trial. Stewart sought $85,280.00 in compensatory damages and $100,000.00 in exemplary and punitive damages from each defendant, plus costs and litigation expenses.

Upon motion the district court dismissed Stewart's action with respect to the West Virginia defendants for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b)(6). The court also granted the Virginia defendants' motion for summary judgment as a matter of law pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 56(b). In their motions all the defendants set up the defense of qualified immunity, contending that they procured Stewart's release in the reasonable, good-faith belief that their action was lawful. The district court reasoned (1) that the Raleigh County Circuit Court's order was not a "detainer" within the meaning of the Interstate Agreement on Detainers; (2) that if the Governor of Virginia had refused to disapprove Stewart's transfer into West Virginia custody, Stewart would have had no remedy; and (3) that Stewart had no right to due process in connection with the Agreement on Detainers. *See Stewart v. Bailey,* Civil Action No.

91–0559–R, slip op. at 3–6 (W.D.Va. Aug. 6, 1992) (mem.). The court held that Stewart's complaint had failed to set forth a clearly established constitutional violation of which a reasonable person would have known. Citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815–16, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982), the court therefore concluded that the defendants were entitled to dismissal or summary judgment on grounds of qualified immunity. *Stewart,* Civil Action No. 91–0559–R, slip op. at 3.

This appeal followed.

## II

Stewart's direct appeal presents three questions for decision. First, he contends that the defendants violated Virginia's version of the Interstate Agreement on. Detainers, *see* Va.Code Ann. §§ 53.1–210 to –215 (Michie 1991 & Supp.1993), by denying him the right to contest West Virginia's request for temporary custody. This violation, Stewart maintains, denied him his right to due process as secured by the Fourteenth Amendment. Second, he argues that the defendants' violation of Virginia's version of the Uniform Criminal Extradition Act, *see* Va.Code Ann. §§ 19.2–85 to –118 (Michie 1990 & Supp.1993), deprived him of rights protected by the Extradition Clause of the Federal Constitution. *See* U.S. Const. art. IV, § 2, cl. 2. Third, he asserts that the defendants violated Va.Code Ann. § 53.1–208, thereby depriving him of a state-created liberty interest protected by the Due Process Clause of the Fourteenth Amendment. Stewart urges that the district court erred by failing to recognize that relief could have been granted on his claims under 42 U.S.C. § 1983, and that he was not precluded from recovery as a matter of law.

We consider Stewart's assignments of error *seriatim.* Because these assignments present pure questions of law, we review the district court's decision with respect to them *de novo. See Jackson v. Kimel,* 992 F.2d 1318, 1322 (4th Cir.1993) (stating that summary judgments granted pursuant to Fed. R.Civ.P. 56 are reviewed *de novo*); *Schatz v. Rosenberg,* 943 F.2d 485, 489 (4th Cir.1991),

*cert. denied sub nom. Schatz v. Weinberg & Green,* —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) (stating that dismissals for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6) are reviewed *de novo* ).

## III

First, we address Stewart's claim respecting the defendants' alleged violation of the Interstate Agreement on Detainers.

■ Enacted by forty-eight states,[1] the District of Columbia, Puerto Rico, the Virgin Islands, and the United States, the Agreement on Detainers provides procedures by which a member state may obtain for trial a prisoner incarcerated in another member jurisdiction, and by which the prisoner may demand the speedy disposition of charges pending against him elsewhere. The Agreement is designed to protect prisoners and prisoner rehabilitation programs in two ways. First, it seeks to eliminate the uncertainty pending charges may create in the prisoner's mind by requiring prompt disposition of those charges. Second, the Agreement attempts to ensure that interruptions of the prisoner's incarceration are cut to a minimum, so that the prisoner's continuous physical presence in the sending jurisdiction's rehabilitative programs will be guaranteed. *See* Va.Code Ann. § 53.1–210, art. I (Michie 1991 & Supp.1993); *United States v. Chico,* 558 F.2d 1047, 1048–49 (2d Cir.1977), *cert. denied,* 436 U.S. 947, 98 S.Ct. 2850, 56 L.Ed.2d 788 (1978).[2]

The provisions of the Agreement on Detainers are invoked only when a "detainer" is filed with the custodial (sending) jurisdiction by another jurisdiction having untried charges pending against the prisoner. To obtain temporary custody, the receiving jurisdiction also must file an appropriate "request" with the sending jurisdiction. *See* Va.Code Ann. § 53.1–210, art. IV(a).[3] The record does not suggest that a detainer ever was filed by West Virginia authorities against Stewart. The parties agree that the Raleigh County Circuit Court's order constituted a writ of habeas corpus *ad prosequendum*—a writ "to remove a prisoner in order to prosecute him in the jurisdiction wherein the offense was committed." *Carbo v. United States,* 364 U.S. 611, 615, 81 S.Ct. 338, 341, 5 L.Ed.2d 329 (1961) (emphasis omitted). The threshold question we confront is whether the Raleigh County Circuit Court's writ of habeas corpus *ad prosequendum* may be considered a "detainer" within the meaning of the Agreement.

The defendants contend that *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978)—in which the Supreme Court held that writs of habeas corpus *ad prosequendum* issued by a federal court to state authorities, directing the production of a state prisoner for trial on criminal charges, are not "detainers" within the meaning of the Agreement, *id.* at 349, 98 S.Ct. at 1841 controls our analysis here. Although we have followed *Mauro* 's holding consistently where federal *ad prosequendum* writs are con-

---

1. Both Virginia, *see* Va.Code Ann. §§ 53.1–210 to –215 (Michie 1991 & Supp.1993), and West Virginia, *see* W.Va.Code §§ 62–14–1 to –7 (1992 & Supp.1993), have enacted the Agreement.

2. The background, purpose, and legislative history of the Agreement on Detainers have been the subject of exhaustive discussion both by the Supreme Court, *see United States v. Mauro,* 436 U.S. 340, 343, 349–56, 98 S.Ct. 1834, 1842–45, 56 L.Ed.2d 329 (1978), and by the Court of Appeals for the Second Circuit, *see United States v. Ford,* 550 F.2d 732, 736–42 (2d Cir.1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

3. Article IV(a) of the Agreement on Detainers provides in relevant part:

> The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a *detainer* and who is serving a term of imprisonment in any party state made available in accordance with Article V(a) hereof upon presentation of a written *request* for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request....

Va.Code Ann. § 53.1–210, art. IV(a) (Michie 1991 & Supp.1992) (emphasis added).

cerned,[4] here we are confronted with a different case: a party state issuing an *ad prosequendum* writ to authorities of a penal institution in another party state. For his part, Stewart contends that this distinction is essential, urging that *Mauro* be read as governing only federal court writs *ad prosequendum*.

The Agreement on Detainers contains no definition of the word "detainer." When Congress enacted the Agreement in 1970, the House and Senate Reports explained that "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep. No. 91–1018, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4864, 4865; S.Rep. No. 91–1356, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4864, 4865. Of course, the definition of "detainer" adopted by Congress can be applied literally only to the Federal Government in its capacity as a "party state" to the Agreement. In the absence of meaningful legislative history of the Agreement's enactment by the Virginia General Assembly, however, the congressional definition is useful; it reflects the fact that the drafters of the Agreement intended "detainer" to possess a general, not a technical, meaning. Thus, a detainer is a

> [r]equest filed by a criminal justice agency with [the] institution in which [a] prisoner is incarcerated, asking [the] institution either to hold [the] prisoner for [the] agency or to notify [the] agency when release of [the] prisoner is imminent.

*Black's Law Dictionary* 449 (6th ed. 1990) (quoting *Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516 (1985)).

The fundamental concept underlying these definitions of "detainer" is notice. As the Supreme Court stated in *Mauro:*

> Unlike a writ of habeas corpus *ad prosequendum* issued by a federal district court . . . a detainer merely puts officials of the

institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison.

*Mauro,* 436 U.S. at 358, 98 S.Ct. at 1846. That a state prosecutor has filed a detainer against a prisoner does not mean that the prisoner is bidden to immediately appear before the requesting jurisdiction's courts. Instead, it simply places authorities in the prisoner's state of confinement on notice that charges are pending against him elsewhere.

■ By contrast, writs of habeas corpus *ad prosequendum* are issued directly by a court of the jurisdiction where an indictment, information, or complaint has been lodged against the prisoner. *Ad prosequendum* writs are immediately executed; as the Court noted in *Mauro,* "enactment of the Agreement was not necessary to achieve [the writs'] expeditious disposition." *Id.* at 360, 98 S.Ct. at 1847. Thus, unlike a detainer, a writ of habeas corpus *ad prosequendum* does not serve merely as notice that a prosecution is pending against a prisoner in another jurisdiction. Instead, it is a court order requesting the prisoner's appearance to answer charges in the summoning jurisdiction. A prisoner is not even "in custody" when he appears in another jurisdiction's court pursuant to an *ad prosequendum* writ; he is merely "on loan" to that jurisdiction's authorities. *See Thomas v. Whalen,* 962 F.2d 358, 361 n. 3 (4th Cir.1992).

In *Mauro* the Court observed that "the issuance of *ad prosequendum* writs by federal courts has a long history, dating back to the first Judiciary Act." *Id.* This history, the Court reasoned, made it fair to assume Congress was aware of the use of such writs by the Federal Government to obtain state prisoners. When legislators used the word "detainer" in enacting the Agreement, they meant something "quite different from a writ of habeas corpus *ad prosequendum.*" *Id.* The same history is present in both West Virginia and Virginia. Both states possess statutes incorporating into the practice of

---

4. *See United States v. Booher,* 752 F.2d 105, 106 (4th Cir.1985); *United States v. Bamman,* 737 F.2d 413, 415–16 (4th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 789, 83 L.Ed.2d 783 (1985); *United States v. Bryant,* 612 F.2d 799, 801–02 (4th Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1855, 64 L.Ed.2d 274 (1980).

their courts "the right and benefit of all writs, remedial and judicial," granted to the English courts by any statute or act of Parliament in aid of the common law prior to 1607. *See* Va.Code Ann. § 1–11 (Michie 1987 & Supp.1993)[5]; W.Va.Code § 56–3–1 (1966 & Supp.1993).[6] Among the "judicial writs" preserved from the courts of Westminster Hall by these statutes are the various writs of habeas corpus, including the writ *ad prosequendum*. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 97–99, 2 L.Ed. 554 (1807) (Marshall, C.J.). Use of the *ad prosequendum* writ, whether to request or to supply a prisoner to the courts of the Commonwealth, is likewise not unknown in Virginia practice. *See Wilkinson v. Youell*, 180 Va. 321, 324–26, 23 S.E.2d 356, 358 (1942) (describing how prisoner was summoned for trial in the Circuit Court of Southampton County by a writ of habeas corpus *ad prosequendum* directed to the sheriff of Norfolk County, who held him in custody).

■ Therefore, we can assume that the General Assembly of Virginia was aware that Virginia courts deployed, and that Virginia prison wardens and law enforcement officials honored, the writ of habeas corpus *ad prosequendum* long before the Agreement on Detainers was enacted. Taking logic one step further, as the *Mauro* Court did, we believe that when the General Assembly used the word "detainer," it meant something quite different from a writ of habeas corpus *ad prosequendum*. Contrary to Stewart's contentions, it is not necessary to construe "detainer" as including these writs in order to keep West Virginia and Virginia from evading their duties under the Agreement. When a state obtains a prisoner by means of a writ of habeas corpus *ad prosequendum*,

the problems the Agreement seeks to eliminate do not arise. Because an *ad prosequendum* writ is executed immediately, there is no danger that the writ will dangle over the prisoner's head and restrain him from meaningful participation in the prison's rehabilitative programs. The writ swiftly runs its course, and is no longer operative after the date upon which the prisoner is summoned to appear. Accordingly, jurisdictions party to the Agreement on Detainers do not circumvent the Agreement by issuing, and honoring, the writ *ad prosequendum*.

■ For the foregoing reasons, we hold that a writ of habeas corpus *ad prosequendum*, issued by the courts of ·a· jurisdiction party to the Agreement on Detainers to state authorities in another party jurisdiction, requesting custody of a state prisoner for trial on criminal charges, is not a "detainer" within the meaning of the Agreement on Detainers. Having concluded that the writ of habeas corpus *ad prosequendum* is not a "detainer" for purposes of the Agreement, the statute's provisions are not triggered, and our inquiry with respect to Stewart's assignment of error under the Agreement is at an end.

### IV

Second, we address Stewart's argument that the defendants, by permitting his transfer without affording him the right to seek the Governor of Virginia's disapproval, violated a state-created liberty interest cognizable as a breach of Fourteenth Amendment due process under 42 U.S.C. § 1983.

Va.Code Ann. § 53.1–208 (Michie 1991 & Supp.1992) reads in pertinent part:

If a similar certificate, similarly executed, shall state that a prisoner has been indict-

---

5. Section 1–11 provides:
   The right and benefit of all writs, remedial and judicial, given by any statute or act of Parliament, made in aid of the common law prior to the fourth year of the reign of James the First, of a general nature, not local to England, shall still be saved, insofar as the same are consistent with the Bill of Rights and Constitution of this Commonwealth and the Acts of Assembly.
   Va.Code Ann. § 1–11 (Michie 1987 & Supp. 1993).

6. Section 56–3–1 provides:

The right and benefit of all writs, remedial and judicial, given by any statute or act of parliament made in aid of the common law prior to the fourth year of the reign of James the First, of a general nature, not local to England, shall still be saved, so far as the same may be consistent with the Constitution of this State, the acts of the general assembly of Virginia passed before the twentieth day of June, eighteen hundred and sixty-three, and the acts of the legislature of this State.
W.Va.Code § 56–3–1 (1966 & Supp.1993).

ed or stands legally charged with a crime outside Virginia, the Director [of the state correctional facility] may, with the approval of the Governor, likewise deliver the prisoner to the officer presenting the certificate. Such delivery may be conditioned upon the return of the prisoner under such circumstances as the Governor may prescribe.

Any officer of the United States, the District of Columbia, or any other state to whom custody of any such prisoner has been surrendered, is hereby clothed with the authority and powers of a sheriff or a state correctional officer with respect to the custody of the prisoner in this Commonwealth.

. . . . .

Va.Code Ann. § 53.1–208. The "similar certificate" and "similarly executed" requirements of this provision rest upon Va.Code Ann. § 53.1–206 (Michie 1991 & Supp.1993), which provides that prisoners may be surrendered to the courts of another jurisdiction as witnesses "if a judge of any court of record . . . of any state certifies under the seal of such court" that the prisoner's presence is necessary. *Id.* The judge certifying his jurisdiction's need for the prisoner must stipulate that "the officer presenting the certificate is authorized to receive custody of such prisoner, and will retain him in his custody until his return" to Virginia, and that "the prisoner will be safely returned to the custody of the Director, . . . as the Director may direct." *Id.*

■ As a threshold matter, we must decide whether the writ of habeas corpus *ad prosequendum* issued by the Raleigh County Circuit Court constitutes a "certificate" within the pale of sections 53.1–206 and 53.1–208. Neither section defines the word "certificate," nor is there meaningful legislative history that might shed light upon it. We note, however, that the writ and the certificate contemplated by the statute share important characteristics. The writ is signed by a judge of the Raleigh County Circuit Court. Like a sealed document, the order is embossed with insignia of its origin, including the signature and notations of the clerk of court who entered it into the tribunal's order

book. To the extent that a seal is simply "[a]n impression made of some device, by means of a piece of metal or other hard substance, kept and used by public authority," *Black's Law Dictionary* 1349 (6th ed. 1990), we have no difficulty concluding that the clerk of court's stamped docket entries constitute a "seal" for purposes of sections 53.1–206 and 53.1–208.

More important than physical features is the way writs of habeas corpus *ad prosequendum* are treated by Virginia prison officials. The summary judgment record indicates that such writs are normally submitted to the Virginia Department of Corrections, where the writ is reviewed for conformity with section 53.1–208. If the writ satisfies the statute, it is submitted to the Governor's office for approval.

These facts establish beyond question that writs of habeas corpus *ad prosequendum* are regularly treated as "certificate[s]" for purposes of section 53.1–208. While we cannot know whether the writ issued by the Raleigh County Circuit Court actually would satisfy the statutory requirements (the Virginia courts not having spoken on the question), the summary judgment record indicates that it might have done so. The record states that the writ "would not have signall[ed] [to the Governor's office] any special needs or precautions to be taken in the transportation of Stewart," and that there was "no reason to believe that the Governor's office would not have approved a writ of habeas corpus *ad prosequendum.*" Accordingly, we find that writs of habeas corpus *ad prosequendum* are treated as "certificates" for purposes of section 53.1–208, and that the writ issued by the Raleigh County Circuit Court satisfied the statutory "certificate" requirement.

■ Having established the applicability of section 53.1–208, we must decide whether the procedures outlined in the statute represent a state created liberty interest. There is no question that section 53.1–208 requires the director of a correctional facility to whom a writ of habeas corpus *ad prosequendum* has been sent to seek the Governor's approval before the prisoner can be released into the custody of the requesting authority. Yet

the defendants urge that section 53.1–208 does not confer rights upon the prisoner; it merely applies to the actions various officials may take in arranging for the transfer of Virginia inmates to other jurisdictions. For his part, Stewart contends that prisoners charged with crimes outside Virginia may only be delivered "with the approval of the Governor." He suggests that this requirement creates a liberty interest subject to independent protection under the Due Process Clause of the Fourteenth Amendment.

The Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." The Amendment protects "the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1972). We examine procedural due process questions in two steps. The first asks whether there exists a liberty or property interest which has been interfered with by the State. *See Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). The second inquires whether the procedures attendant upon that deprivation were constitutionally sufficient. *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983); *see Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989).

State statutes and rules generally establish liberty or property interests to the extent they prescribe substantive rules of decision: the regulation must create "substantive predicates" to guide the decisionmaker's discretion, such as "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Id.* at 462–63, 109 S.Ct. at 1909–10. Certainly state law may create enforceable liberty interests in the prison setting: certain regulations may grant inmates a protected interest in parole, *see Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); in good-time credits, *see Wolff,* 418 U.S. at 566–72, 94 S.Ct. at 2979–82 and in freedom from involuntary transfer to a mental hospital, *see Vitek v. Jones,* 445 U.S. 480, 487–94, 100 S.Ct. 1254, 1260–64, 63 L.Ed.2d 552 (1980). On the other hand, state statutes and regulations may not create a protected liberty interest in transfer to another prison. *See Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (intrastate transfer); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983) (interstate transfer). That certain state-created liberty interests have been found to be entitled to due process protection, while others have not, is not the product of the Supreme Court's judgment "as to what interests are more significant than others." *Thompson,* 490 U.S. at 461, 109 S.Ct. at 1909 (footnote omitted). Instead, the Justices' "method of inquiry in these cases always has been to examine closely the language of the relevant statutes and regulations." *Id.*

After careful examination of the statutory language, we conclude that all section 53.1–208 does is prescribe procedures: receipt of a "certificate"; submittal of the certificate to the Governor; and discretionary release of the prisoner into the custody of officials from the requesting jurisdiction. Even if the Governor approves a transfer, the prisoner's actual release remains discretionary with the director of his correctional institution. *Cf.* Va.Code Ann. § 53.1–208 ("the Director *may* ... likewise deliver the prisoner" into the custody of requesting authorities).

We do not doubt that the words "with the approval of the Governor" constitute "explicitly mandatory language," *Thompson,* 490 U.S. at 463, 109 S.Ct. at 1910, which the state may not lawfully ignore. But section 53.1–208 creates no "specified substantive predicates" to limit the prison director's, or for that matter the Governor's, discretion in determining whether to permit the transfer of custody to take place. The statute does not purport to guide the decisionmaking process at all. That the request must be submitted to the Governor for approval does not afford the prisoner an opportunity to contest the request; it merely offers the Governor the chance to determine, in the exercise of his discretion, whether the prisoner's transfer is in the best interest of the Commonwealth. When a state does not comply with a procedure specified in one of its own statutes or rules, it has violated that statute or rule, and

nothing more. Thus, Stewart's remedy for the defendants' violation of section 53.1–208 lies not in an action to vindicate his due process rights under 42 U.S.C. § 1983, but in an action brought directly under the statute in state court.

We hold that the defendants' failure to submit the Raleigh County Circuit Court's writ of habeas corpus *ad prosequendum* to the Governor for approval did not deprive Stewart of "liberty" or "property" within the meaning of the Fourteenth Amendment. Accordingly, his claim under section 53.1–208 cannot support a violation of the Constitution [7] or laws of the United States for purposes of 42 U.S.C. § 1983.

## V

We now turn to Stewart's claim that the defendants violated the Uniform Criminal Extradition Act by releasing him into West Virginia's custody, thereby depriving him of rights protected by the Extradition Clause of the Federal Constitution.

Here we need not dwell long. The Uniform Criminal Extradition Act, as enacted by the Virginia General Assembly, *see* Va.Code Ann. §§ 19.2–85 to –118 (Michie 1990 & Supp.1993), governs the transfer of fugitives from justice found in Virginia. The introductory section of the Act states that

> [s]ubject to the provisions of this chapter, ... the Governor shall have arrested and delivered up to the executive authority of any other of the United States any person charged in that state with ... crime, who has fled from justice and is found in this Commonwealth.

*Id.* § 19.2–86. The Act addresses the extradition only of persons who have "fled from justice." Stewart is clearly not such a person. Therefore, Stewart's contentions with respect to the Uniform Criminal Extradition Act are without merit.

Stewart's reliance upon *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641

(1981), is misplaced. He argues that *Cuyler* stands for the proposition that "prisoners are also entitled to ...˙ protections under the UCEA in any jurisdiction, such as Virginia, which has adopted it." This statement is true, but it is only part (and a misleading part at that) of the Supreme Court's holding in *Cuyler*. A prisoner incarcerated in a jurisdiction that has adopted the Uniform Criminal Extradition Act is entitled to the procedural protections of that Act before being transferred to another jurisdiction pursuant to Article IV of the Agreement on Detainers, including the right to a pretransfer hearing. *See id.* at 443–50, 101 S.Ct. at 709–12. Stewart is not a "prisoner" in the sense contemplated by the Uniform Criminal Extradition Act, because he was not a fugitive from justice when his presence in Raleigh County was sought. Moreover, Stewart was not being transferred to West Virginia pursuant to Article IV of the Agreement on Detainers, because the Raleigh County Circuit Court's writ of habeas corpus *ad prosequendum* does not constitute a "detainer" within the meaning of the Agreement. The Agreement is not implicated here; the Uniform Criminal Extradition Act is likewise irrelevant.

## VI

Because we conclude that none of the Virginia statutes invoked by Stewart supports his attempt to vindicate his Fourteenth Amendment due process rights, we need not review the district court's conclusions regarding the defendants' qualified immunity.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*

---

7. In his complaint Stewart also contended that the defendants' violation of section 53.1–208 violated his rights under the Equal Protection Clause of the Fourteenth Amendment. We decline to review this allegation because Stewart failed to argue the point on appeal, and therefore

abandoned it. *See* Fed.R.App.P. 28(a)(5), (b); *Shopco Distrib. Co. v. Commanding General,* 885 F.2d 167, 170 n. 3 (4th Cir.1989) (stating that failure to comply with terms of former version of Federal Rule of Appellate Procedure 28(a)(5) constitutes forfeiture of asserted claims).