Elton HOLMES, Plaintiff,

v.

James COOPER, et al., Defendants.

Civ. A. No. 94–0125–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Jan. 5, 1995.

---

Elton Holmes, pro se.

Pamela A. Sargent, Asst. Atty. Gen., Richmond, VA, for defendants.

### Memorandum Opinion

CONRAD, United States Magistrate Judge.

Plaintiff Elton Holmes, an inmate at Tidewater Correctional Unit # 22, has filed this *pro se* civil action pursuant to 42 U.S.C. § 1983, with jurisdiction vested pursuant to 28 U.S.C. § 1343. Plaintiff complains that, while he was housed at Dillwyn Correctional Center ["DCC"], defendants downgraded his Good Conduct Allowance ["GCA"] status without providing him with the due process to which he was entitled. Plaintiff names James Cooper, Sergeant Miller, Counselor R. Volt and Warden Daniel T. Mahon as defendants. Plaintiff seeks injunctive relief, in the form of a new hearing, and monetary damages. The case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c).

On May 18, 1994, plaintiff filed a motion for summary judgment. The defendants, through counsel, subsequently filed a motion for summary judgment of their own. By order dated November 3, 1994, the court denied both motions for summary judgment. Defendants have since filed a motion to reconsider. The court notified the plaintiff of the defendants' motion as required by *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), and warned plaintiff that judgment might be granted for the defendants if plaintiff did not respond to the motion. Plaintiff has not

responded, but sufficient time has passed that this motion is now ripe for disposition.

In their motion to reconsider, defendants argue that, in denying their motion for summary judgment, the court incorrectly concluded that plaintiff has some vested liberty interest in his GCA status. Upon further consideration, the court agrees that the defendants' motion for summary judgment should have been granted.

Upon a motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). However, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the adverse party's pleadings. Instead, the adverse party must respond by affidavits or otherwise and present specific facts showing that there is a genuine issue of disputed fact for trial. Fed. R.Civ.P. 56(e). If the adverse party fails to show a genuine issue of fact, summary judgment, if appropriate, may be entered against the adverse party.

Under Virginia Code § 53.1–199, each inmate at a Virginia correctional facility has an opportunity to earn GCA credits based on his individual adjustment and performance. These credits are then applied to reduce both an inmate's maximum term of confinement and the time he must serve before he is eligible for parole. The rate at which an inmate earns these credits is a function of his GCA classification status. Inmates in Class I earn credits at a rate of thirty days for every thirty served, while inmates in the lower classes earn credits in decreasing gradations of ten for every thirty days served, until they reach Class IV at which inmates earn no GCA credits whatsoever.

Under Departmental Operating Procedure ["DOP"] 806, promulgated pursuant to Virginia Code § 53.1–200, an inmate's GCA status may be downgraded under two different sets of procedures. First, an inmate's status may be downgraded when the ICC annually conducts a hearing to review his GCA assignment. Second, the Adjustment Committee may refer an inmate to the ICC for immediate review if the inmate incurs an institutional infraction.

No matter what the justification for the hearing, an inmate is placed in one of the GCA levels based on the sum total of the numerical scores he receives from various individuals in five separate categories. The total numerical score an inmate receives may be rejected, however, if the ICC or the Central Classification Board ["CCB"] determines that the score is subject to one of six overrides: (1) an inordinately high or low point score in one area of evaluation, (2) a recent serious institutional infraction, (3) a significant recent decrease in an area of evaluation, (4) extraordinary improvement in one or more areas of evaluation, (5) a lack of available educational programs, if this situation had a negative impact on inmate's score, and (6) a need for more information. Any decisions made by the ICC are also subject to the approval or disapproval of the warden at the inmate's correctional facility. Under DOP 821, the warden may not "veto" those actions of which he disapproves, but must appeal the decisions of the ICC to the CCB.

In his complaint, plaintiff claims that on September 27, 1993, defendants Cooper, Miller and Volt conducted a hearing at which plaintiff's GCA status was downgraded. He maintains that he learned of the GCA hearing only when he received an evaluation sheet informing him that his GCA class had been changed from level II to level IV. At the same time, plaintiff apparently also discovered the contents of a written form defendant Volt had shown plaintiff while plaintiff

was in solitary confinement. Plaintiff contends that, because he is illiterate, he was unable to comprehend the nature of the notice at the time it was originally shown to him, and thus he refused to sign the notice without first being informed of its contents. According to plaintiff, Counselor Volt never explained to him the contents of the notice or the effect plaintiff's failure to sign had on his rights, but merely instructed a correctional officer to witness plaintiff's refusal to sign. Plaintiff maintains that, as a result of the hearing subsequently held outside of plaintiff's presence, his scheduled release date was postponed because of the lost opportunity to earn GCA credits on a day to day basis. He maintains that, had he been present, he could have successfully argued that he failed to enroll in an educational program only because none was available.

Defendants, on the other hand, contend that all of plaintiff's due process rights were observed at the hearing in which the plaintiff's GCA status was reviewed. Defendants claim that they were aware of plaintiff's illiteracy and therefore had someone read plaintiff the Institutional Classification Committee ["ICC"] Notification Form, the ICC Hearing Checklist and the ICC Disposition. Although defendants concede that no staff member was assigned to assist plaintiff at the hearing, they maintain that the plaintiff was in fact present. Despite his presence, they claim, plaintiff nevertheless received a numerical score placing him in Level IV, which entitled him to zero GCA credits for each day of actual time served. They argue that the lack of educational programs at DCC was well-known but that plaintiff had had educational opportunities he chose not to pursue at his previous institution.

The facts presented in this case represent a unique situation in that the decisions in both *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983), potentially come into play. In *Wolff,* the Supreme Court mandated procedural safeguards when loss of statutory good-time credits is at issue. However, in *Hewitt,* the Court indicated that the controlling factor in determining whether an

inmate is entitled to procedural safeguards is whether statutory language confers a vested liberty interest in the inmate. The two opinions appear to be at odds to the extent that *Wolff* seems to turn on the punitive nature of an action taken against the individual inmate and its corresponding effect on his liberty, while *Hewitt* concerns itself only with mandatoriness of the language in the statute or regulation authorizing such action. The two cases are distinguishable, however. In *Wolff,* the Court dealt with circumstances in which the action taken against the inmate came pursuant to disciplinary proceedings. In *Hewitt,* the Court addressed a situation in which an inmate had been negatively affected by an administrative decision made in the interest of maintaining institutional order.

In *Wolff,* the Court rejected the assertion of the defendants that "the interest of prisoners in disciplinary procedures is not included in that 'liberty' protected by the Fourteenth Amendment." 418 U.S. at 556–557, 94 S.Ct. at 2975. The Court noted that, although "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," the State, "having created the right to good time and ... recogniz[ed] that its deprivation is a sanction authorized for major misconduct," cannot thereafter take away good-time credit without first providing due process to the inmate whose interests are affected. *Id.* at 557, 94 S.Ct. at 2975. The Court concluded by stating that, because the deprivation of good-time credits only accompanies misconduct, the determination of whether such misconduct has occurred becomes critical and entitles the inmate to due process protection. *Id.* at 558, 94 S.Ct. at 2975–76.

In the present case, however, plaintiff was not brought before a disciplinary committee for the determination of whether he should have received punishment. The change in plaintiff's GCA status came as a result of an annual review by the ICC. Although the downgrade of plaintiff's GCA status had the practical effect of "punishing" him for not having affirmatively pursued any educational programs during the previous year, the hearing was not triggered by any specific event. In fact, under the current system of GCA

classification in Virginia, even if plaintiff's appearance before the ICC had been triggered by the issuance of an institutional charge, his guilt or innocence in regard to that offense would have been decided prior to the ICC's review of his GCA status.

In other words, it appears to the court that the role of the ICC in the GCA assessment is not to make factual determinations as to whether an inmate has committed a specific institutional infraction. Instead, the ICC is charged to assess plaintiff's institutional record and evaluate his progress and performance. In making this evaluation, the ICC necessarily must take into consideration a large variety of institutional goals and objectives. Although, under these circumstances, an inmate may very well benefit somewhat by having an opportunity to present justifications for his conduct, he can do very little, if anything, to affect the content of his record or the factual bases for his score.

■ In summary, an ICC hearing held for the purpose of adjusting an inmate's GCA assignment differs from a disciplinary hearing in two substantial respects. First, a negative outcome at an ICC hearing does not have the stigma of wrongdoing or punishment attached to it. *See Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872. Unlike a disciplinary conviction, a downgrade in GCA status leaves no lasting black mark on the prisoner's institutional record. Second, while the outcome at a disciplinary hearing turns on a very precise set of facts, the ICC's GCA assessment involves a holistic approach to both the inmate's record and the goals of the institution. In the context of a disciplinary hearing, due process rights enable the inmate to present evidence in his own favor on very specific charges. However, even were an inmate afforded a full panoply of due process rights during a GCA assessment, he could do little to influence the outcome because, rather than being dependent on factual determinations, it involves a much broader assessment which does not necessarily turn on the proof or disproof of specific propositions.

■ Accordingly, the court is of the opinion that whether plaintiff was entitled to due process at his annual review must be analyzed under *Hewitt.* Under *Hewitt,* lawfully incarcerated persons retain only a narrow range of protected liberty interests, while prison administrators have broad discretion in the management of correctional institutions. 459 U.S. at 467, 103 S.Ct. at 869. The opportunity to earn good time credits is not a constitutionally established liberty interest. *Wolff,* 418 U.S. at 557, 94 S.Ct. at 2975. Consequently, the court must look to state law or regulation to determine if a protected liberty interest has been created. The use of explicitly mandatory language in regulations governing the award of GCA credits would create such a liberty interest. *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871–72. The regulation must require both that the administration use certain procedures *and* must place specified substantive limits on the administrator's discretion. *Id.* Procedural protections, standing alone, even if clearly mandated by state law, do not create a liberty interest in either the procedures themselves or the substantive result they purportedly protect. *Stewart v. Bailey,* 7 F.3d 384, 392 (4th Cir.1993). Moreover, in order to create a liberty interest, not only must there be substantive limits placed on the decision-maker's discretion, but the substantive predicates must mandate a certain result once the relevant objective criteria are met. *Slezak v. Evatt,* 21 F.3d 590 (4th Cir. 1994), *citing Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 464, 109 S.Ct. 1904, 1910–11, 104 L.Ed.2d 506 (1989).[1]

■ Applying these principles here, the court concludes that plaintiff has no constitutionally protected liberty interest in his GCA status. Although the numerical scores an inmate receives places him definitively in one of the four levels of the GCA classification

---

1. The holdings in *Thompson* and *Slezak* support this court's reading of *Wolff.* Under this court's interpretation, inmates are entitled to due process in the context of a disciplinary hearing partly because the result in such a hearing turns strictly on a factual determination. In fact, one could easily argue that the same result in *Wolff* would be reached if decided under *Hewitt.* Nevertheless, this court is of the opinion that *Wolff* independently requires that disciplinary hearings comply with a certain level of due process.

system, the six override provisions grant prison officials wide discretionary authority to reject the numerical score and place the inmate at another level. Consequently, even were plaintiff correct in his argument that he should have received a higher score in the area of education so as to have qualified him for Class III, plaintiff would not have been entitled to that result because prison officials could have chosen to reject his score on the basis of one of the overrides. Under *Slezak, supra,* the mere fact that prison officials have the authority to alter results in this manner defeats plaintiff's claim that he has a liberty interest in remaining in a particular GCA class.[2]

 Even after viewing the evidence in a light most favorable to the plaintiff, therefore, the court finds that the defendants are entitled to judgment as a matter of law. Although the regulations themselves require that an inmate receive a due process hearing before his GCA status is changed, plaintiff does not become *constitutionally* entitled to any procedural protections unless there are also substantive predicates which, if met, mandate a particular result. *Slezak, supra.* In the alternative, plaintiff would have been entitled to some level of due process if the change in his GCA status was intended as a punishment or a disciplinary action. *Wolff, supra.* However, under the facts presented, neither of these circumstances exists. Accordingly, even assuming that plaintiff did not receive notice of the hearing, that he had no appointed advisor, and that he was not present at the hearing, his constitutional right to due process was neither implicated or violated by the ICC's review of his GCA status.

For the reasons stated above, the court finds that the defendants' motion to reconsider must be granted. The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of the Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5) or 4(a)(6).

The clerk of the Court is directed to send certified copies of this Memorandum Opinion and accompanying Order to plaintiff and to counsel of record for the defendants.

### Order

In accordance with the written Memorandum Opinion entered this day, it is hereby ADJUDGED and ORDERED that the defendants' Motion to Reconsider be and hereby is GRANTED.

This case will be stricken from the active docket of the court. The clerk of the Court is directed to send certified copies of this Order to plaintiff and to counsel of record for the defendants.

---

2. Ironically, plaintiff argues that he was prejudiced at his ICC hearing because the members of the committee did not choose to reject his numerical score upon the basis of one of the overrides. Plaintiff contends that he was unable to pursue score-bolstering educational programs because none was available at DCC. Yet, it is the fifth override provision which allows the ICC to take into account the unavailability of educational programs when determining the GCA class in which an inmate should be placed.