Anthony GREEN, Petitioner–Appellant,

v.

William D. CATOE, Director, South Carolina Department of Corrections; Charles M. Condon, Attorney General, State of South Carolina, Respondents–Appellees.

No. 99–30.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 2000

Decided Aug. 1, 2000

**ARGUED:** Leonard M. Singer, Craighead Glick, L.L.P., Boston, Massachusetts, for Appellant. Donald John Zelenka, Assistant Deputy Attorney General, South Carolina Office of the Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Teresa L. Norris, Center for Capital Litigation, Columbia, South Carolina, for Appellant.

Before WILKINS, MOTZ, and KING, Circuit Judges.

Affirmed by published opinion. Judge KING wrote the majority opinion, in which Judge WILKINS joined. Judge DIANA GRIBBON MOTZ wrote a dissenting opinion.

## OPINION

KING, Circuit Judge:

Anthony Green appeals from the judgment of the district court in South Carolina denying his petition for habeas corpus relief. In this appeal, Green challenges the dismissal of two claims: (1) that the Supreme Court of South Carolina denied him procedural due process in the course of resolving his direct appeal; and (2) that he was denied effective assistance of counsel at sentencing, in violation of the Sixth Amendment. We have carefully considered these claims and agree that Green is not in custody in violation of the Constitution or laws of the United States. We

therefore affirm the judgment of the district court.

## I.

In the afternoon of November 21, 1987, Susan Babich parked her car in the rear lot of the Charles Towne Square Shopping Mall in Charleston, South Carolina. After shopping at the mall, she returned to her car; before she could drive away, however, she was approached by Green, who advanced rifle in hand. Green then shot Ms. Babich in the head, stole her pocketbook, and fled the scene in another car. Based on a description from an eyewitness, the police soon apprehended Green in the vicinity of the mall. The police found the rifle and Ms. Babich's checkbook in Green's car, and Green ultimately gave a statement admitting to his involvement in these crimes.

Green was tried by jury in Charleston County, South Carolina. The jury found Green guilty of murder and armed robbery and, after a separate sentencing proceeding, recommended a sentence of death. On direct appeal, the Supreme Court of South Carolina upheld Green's conviction and sentence. *See State v. Green,* 301 S.C. 347, 392 S.E.2d 157, 158 (1990). Following the exhaustion of his remaining state remedies, including an application for post-conviction relief, Green filed a petition for federal habeas corpus relief. The district court then considered and dismissed his petition. With its dismissal, the district court granted Green a certificate of appealability to this Court. *See* 28 U.S.C. § 2253. From the dismissal, Green brings this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a writ of habeas corpus unless the state's adjudication of a claim resulted in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). As the Supreme Court recently made clear:

> [Section] 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.... Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor,* —— U.S. ——, ——, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).

■ In this appeal, Green asserts two constitutional grounds for habeas corpus relief: (1) a Due Process violation and (2) a Sixth Amendment violation. With respect to Green's Sixth Amendment claim, the South Carolina trial court that considered Green's application for post–conviction relief (the "state PCR court") issued an extensive opinion explaining why Green was not entitled to relief on that basis. However, the separate Due Process claim raised by Green is in a different procedural posture, since it was only presented to the Supreme Court of South Carolina in the petition for rehearing submitted to that court following resolution of Green's direct appeal. The "adjudication" of this claim is explained by two sentences: "Petition for Rehearing is denied," signed by

four Justices; and "I would grant," signed by one Justice.

Under our precedent, this perfunctory rejection of Green's Due Process claim does constitute an "adjudication" for purposes of section 2254(d)(1). *See Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.1998); *Wright v. Angelone*, 151 F.3d 151, 156–57 (4th Cir.1998). Nonetheless, as we made clear in *Cardwell:*

> [B]ecause the state court decision fails to articulate any rationale for its adverse determination of Cardwell's claim, we cannot review that court's "application of clearly established Federal law," but must independently ascertain whether the record reveals a violation of [a constitutional right].... Where, as here, there is no indication of how the state court applied federal law to the facts of a case, a federal court must necessarily perform its own review of the record. *Thus, on the facts of this case, the distinction between de novo review and "reasonableness" review becomes insignificant.*

*Cardwell*, 152 F.3d at 339 (emphasis added) (quotation omitted). Accordingly, because there is no indication of how the Supreme Court of South Carolina applied federal law to the facts of Green's Due Process claim, we must review that claim under the *Cardwell* standard.

### B.

During jury selection, the trial court declined to remove three jurors, whom Green had moved to excuse for cause, from the jury venire, so Green used peremptory challenges on all three. Green ultimately exhausted his peremptory challenges, after which two jurors were seated on the jury that convicted Green and condemned him to death.

Green asserts that under the law of South Carolina, as it existed prior to the resolution of his direct appeal, he was entitled to a new trial if he made two showings: (1) that he had been forced to use a peremptory challenge on a venireperson who should have been excused for cause, and (2) that he had exhausted his peremptory challenges before the jury was impaneled. On direct review, the Supreme Court of South Carolina concluded that the trial court had erred in denying Green's motion to excuse, for cause, one of the three jurors at issue. *Green*, 392 S.E.2d at 159–61. According to Green, at that point, he had satisfied the two then-existing prerequisites for a new trial. However, in his direct appeal, the Supreme Court of South Carolina declined to award Green a new trial, instead imposing what Green characterizes as a "new" third requirement—that "this error deprived him of a fair trial" (the "fair trial element"). *Green*, 392 S.E.2d at 160. Because Green could not make this third showing, he was denied a new trial by the Supreme Court of South Carolina.

Green asserts that the imposition of this fair trial element, which previously had not been required under South Carolina law, was effected without proper notice, in violation of his right to procedural due process. Specifically, Green asserts that the law was changed and retroactively applied to his appeal, and if he had been given proper notice, he could have (1) made a record at trial sufficient to demonstrate that he had been denied a fair trial, and (2) argued against a change in the law on direct appeal.

### 1.

Before turning to the merits of Green's Due Process claim, we note that the State agrees with Green that this claim has been properly preserved; indeed, it could not have argued otherwise. The alleged Due Process violation arose from the Supreme Court of South Carolina's resolution of his direct appeal; thus, this claim could not have been raised prior to Green's petition for rehearing thereon. In *Sellers v. Boone*, 261 S.C. 462, 200 S.E.2d 686, 687 (1973), the Supreme Court of South Carolina stated that if an error arose out "of

[an] affirmance by an appellate court," an appellant may seek a review of the alleged error on the merits in a petition for rehearing. Green included his argument in his petition for rehearing, and we thus agree with the State that Green presented the Due Process claim to the State, the State adjudicated the claim, and Green has exhausted his state remedies with respect to the claim.

### 2.

■ Under the Fourteenth Amendment, no state "may deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Inasmuch as Green has alleged a deprivation of procedural due process, our analysis involves two steps. *Stewart v. Bailey,* 7 F.3d 384, 392 (4th Cir.1993). First, we must determine "whether there exists a liberty or property interest which has been interfered with by the State." *Id.* Second, we must ascertain "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.*

### a.

■ With respect to the first step of the Due Process analysis, many state-created rights have been accorded the status of liberty or property interest within the meaning of the Fourteenth Amendment. *See, e.g., Brinkerhoff–Faris Trust & Savings Co. v. Hill,* 281 U.S. 673, 677, 50 S.Ct. 451, 74 L.Ed. 1107 (1930); *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Thus, state-conferred rights have been recognized as liberty or property interests that are "sufficiently embraced within Fourteenth Amendment 'liberty' to entitle [defendants] to ... minimum procedures appropriate under the circumstances." *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963. Of course, a state has "the authority to create, or not," each of these rights; however, once created, the Due Process clause guarantees "that the state-created right is not arbitrarily abrogated." *Id.* Within this context, we must examine the right that Green claims was abrogated by South Carolina.

According to Green, prior to the resolution of his appeal, a defendant who established two elements: (1) that he was forced to use a peremptory challenge on a venireperson who should have been excused for cause; and (2) that he had exhausted his peremptory challenges before the jury was impaneled, was absolutely entitled to a new trial. Under the then-controlling law of South Carolina as articulated by Green, the Supreme Court of South Carolina was without discretion to deny him a new trial under the facts present in his appeal. In other words, Green's asserted state-created right, which would be subject to the guarantee of procedural due process, is his right to a new trial.

For authority that he was previously guaranteed a new trial under these circumstances, Green first relies upon *State v. Sanders,* 103 S.C. 216, 88 S.E. 10, 12 (1916). There, the Supreme Court of South Carolina reversed and remanded a criminal conviction based solely on an argument raised by the appellant that a motion to excuse for cause had been erroneously rejected, causing him to use a peremptory challenge. The court remanded for a new trial based upon the following findings:

> His honor, the presiding judge ruled that the juror was competent, and that he should be presented to the prisoner who rejected him [using a peremptory challenge]. It is admitted that the defendant exhausted his peremptory challenges before the panel of jurors was completed. It is true the juror stated that he could give the prisoner and the state a fair and impartial trial; but, as he also stated that he felt a resentment in this particular case, which might prejudice him in rendering a verdict, that, as stated, he felt a prejudice in this particular case, and that he felt a natural resentment against a lawyer of the colored race, pleading to a jury of which he was a member, this court is satisfied that his

honor, the circuit judge, erroneously exercised his discretion in ruling that the juror was competent.

*Id.* at 12. The import of this holding is clear: if a motion to excuse a juror is improperly denied, the defendant then uses a peremptory challenge on that juror, and the defendant runs out of peremptory challenges before the last juror is seated, then the defendant is entitled to a new trial.

Green also relies upon *State v. Anderson,* 276 S.C. 578, 281 S.E.2d 111, 112 (1981), to assert that he was previously guaranteed a new trial. During Anderson's trial, the court had allotted the defendant five peremptory challenges, instead of the ten required by statute. *Id.* The Supreme Court of South Carolina held: "We think appellant, having objected to the limitation and having exhausted her allotted challenges, has shown prejudice. To venture a sixth challenge would have been futile." *Id.* at 112. The court thus granted a new trial in *Anderson* with no mention whatsoever of a "fair trial" element; instead, it was sufficient that an objection was raised and the defendant's peremptory challenges were exhausted.

Significantly, in a case decided nine years after the 1990 decision resolving Green's direct appeal, the Supreme Court of South Carolina again noted that no "fair trial" demonstration was necessary in the context of an error relating to peremptory challenges. *See State v. Short,* 333 S.C. 473, 511 S.E.2d 358, 360–61 (1999). There, in circumstances analogous to Green's, the court "adopt[ed] the majority rule that no showing of actual prejudice is required to find reversible error for the denial or impairment of the right to a peremptory challenge." *Id.* at 360. It did so in agreement with the Court of Appeals of South Carolina, which had concluded that "there was no way to determine with any degree of certainty whether [the defendant's] right to a fair trial by an impartial jury was abridged." *Id.* Although *Short* was decided in the context of a challenge under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the broad language and rationale of *Short* are applicable to cases in which a defendant is denied a peremptory challenge by a trial court's improper denial of a motion to excuse a juror for cause.[1]

The State responds with two arguments. First, it asserts that we should not be attempting to ascertain whether the fair trial element was "new" because the Supreme Court of South Carolina has indicated that it was not. Specifically, in the course of discussing the fair trial element during the resolution of Green's appeal, the court stated:

In most of the South Carolina cases involving peremptory challenges, appellants have failed to satisfy the first step of this process. In only one South Carolina case have we reached the second step of the review procedure. *State v. Cooper,* 291 S.C. 332, 353 S.E.2d 441 (1986).[2] In *Cooper,* appellant asserted that the trial court erroneously qualified a highway patrolman as a juror who should have been excused for cause because he fell under a statutory exclusion. For purposes of that opinion, we clarified the application of the statute and noted the judge's error in his interpretation of the statute. However, because

---

**1.** Green also cites at least seventeen other decisions in which the Supreme Court of South Carolina considered the same issue raised by Green, and in each of those cases, the court discussed a two-element test without mentioning the fair trial element imposed in Green's appeal. In addition, Green quotes from a treatise relating to South Carolina law, which summarized the law as it stood before the resolution of Green's direct appeal: "South Carolina treats the wrongful depriva-

tion of a peremptory challenge as error per se so long as all peremptory challenges are exhausted." Br. for Appellant at 23 (quoting William S. McAninch & W. Gaston Fairey, *The Criminal Law of South Carolina* 146 (2d ed.1989)).

**2.** We note that *Cooper* makes no mention whatsoever of the fair trial element.

we reversed that case for other reasons, it was not necessary for us to determine whether that error alone would have warranted reversal. In other words, we did not engage in the third[, fair trial] step of the process: . . . .

392 S.E.2d at 160. This passage at least implies that the fair trial element has always been an unstated element of the test for a new trial. In reliance thereon, the State argues that we are not entitled to second-guess, in a federal habeas corpus proceeding, a state court's construction of its own law.

Second, the State relies upon two pre–1990 decisions in which the Supreme Court of South Carolina alluded to the fair trial element ultimately made explicit in *Green. See State v. Weaver,* 58 S.C. 106, 36 S.E. 499, 501 (1900); *State v. Plath,* 277 S.C. 126, 284 S.E.2d 221, 227 (1981). A century ago, in *Weaver,* one ground upon which an appellant sought review was the trial court's erroneous denial of a motion to excuse a juror for cause, which the defendant claimed resulted in the premature exhaustion of his peremptory challenges. The Supreme Court of South Carolina rejected this as a basis for a new trial for several reasons. First, it noted that this assertion was "speculative" because none of the jurors who were actually seated had been challenged—either peremptorily or for cause. *Id.* at 500. Second, the court found that the trial court had *not* erred in declining to excuse the juror for cause. *Id.* at 501. Third, the court noted, in the alternative, that "in view of the fact that, so far as appears from the record before us, there was not a single person on the jury which tried the case to whom any objection was interposed, we do not see that the appellants have any legal ground of complaint." *Id.* Fourth, the court found that the defendant had not exhausted his peremptory challenges before the jury was impaneled. *Id.* Although the first and third bases relied upon in *Weaver* were holdings in the alternative, the court, in those bases, at least suggested the "fair

trial" showing to be necessary before a new trial would be ordered.

Subsequently, in the 1981 *Plath* decision, South Carolina again appeared to endorse a fair trial element. *Plath,* 284 S.E.2d at 227. There, the defendant claimed error in the trial court's rejection of his attempt to exercise a peremptory challenge after the jury had been seated but before it had been sworn. The court essentially assumed that the denial had been error but nonetheless found no abuse of discretion because the defendant could not demonstrate the deprivation of a fair trial flowing from this error:

> [T]he rationale of the court in [*State v. Holland,* 261 S.C. 488, 201 S.E.2d 118, 118 (1973) ] is applicable: . . . "No showing was made to the court at trial, nor has any been made since, to indicate bias or lack of impartiality on the part of this juror[, whom defendant had attempted to excuse by peremptory challenge on the third day of trial]" . . . . [Similarly,] Plath had ample opportunity to examine the prospective juror on voir dire. The record shows the trial judge gave counsel for Plath two opportunities to strike the juror; one when she was accepted and the other later in the jury selection process. Furthermore, co-defendant Arnold contended removing a juror after all of the jurors and alternates had been seated would prejudice his case. *Plath has not shown the requisite prejudice to him in order to hold the trial judge abused his discretion by refusing to allow the belated peremptory challenge to be exercised.*

*Id.* at 227 (emphasis added). This passage implied that, even if it was error to deny the use of a peremptory challenge, that error would not constitute an abuse of the trial court's discretion unless some "showing" could be made that a juror seated on the panel was "bias[ed]" or "impartial[ ]." *Id.* The State relies upon *Weaver* and *Plath* in asserting that the fair trial element—articulated as the third element in the 1990 decision resolving Green's direct

appeal—has actually been, for the last century, an unstated element of the new trial test.

On the contrary, we believe that under the South Carolina law in effect prior to Green's appeal, he had a clearly established right to a new trial upon a demonstration of two elements—(1) that he had wasted a peremptory challenge on a juror who should have been excused for cause, and (2) that he exhausted his peremptory challenges before the jury was impaneled—but without the third element—a demonstration that he had been deprived of a fair trial. Although the view of the Supreme Court of South Carolina relating to the law in that state would ordinarily be conclusive on this question, we are unable to rely upon that view here because the highest court has articulated conflicting characterizations of its law. In its 1990 *Green* decision, the Supreme Court of South Carolina arguably implied that the fair trial element had always been an unstated part of the new-trial test, but, in its 1999 *Short* opinion, the court stated that such a showing had *never* been required:

> We now overrule *Plath* and adopt the majority rule that no showing of actual prejudice is required to find reversible error for the denial or impairment of the right to a peremptory challenge. We note that *Plath* is distinguishable from our other decisions discussing "prejudice" in the denial of a peremptory challenge where the issue actually turned on whether the complaining party had established he was denied the right to exercise a peremptory challenge. *Where such a denial was established, we implicitly applied the majority rule discussed above and reversed without a showing of actual prejudice. See State v. Anderson,* 276 S.C. 578, 281 S.E.2d 111 (1981) (prejudice in wrongfully limiting number of peremptory challenges where defendant exercised all permitted); *Moore v. Jenkins,* 304 S.C. 544, 405 S.E.2d 833 (1991) (failure to use side-to-side procedure in allowing peremptory challenges in a case with multi-

ple defendants prejudiced the plaintiff as a matter of law). In cases finding no prejudice, on the other hand, we actually determined the complaining party had not established the denial of a peremptory challenge. *See Laury v. Hamilton,* 317 S.C. 503, 455 S.E.2d 173 (1995) (no prejudice where party received greater number of strikes than that to which he was entitled under side-to-side method); *State v. Holland,* 261 S.C. 488, 201 S.E.2d 118 (1973) (no prejudice in limiting number of peremptory challenges where defendants used fewer than allowed). Before reversible error can be found, the complaining party must of course establish the denial of his right to exercise a peremptory challenge.

*Id.* at 360–61 (emphasis added). Thus faced with two statements—(1) an initial statement that the fair trial element has always been implied in the test, and (2) a subsequent statement that the fair trial element had, by negative implication, never been part of the test—we cannot unquestioningly rely on the Supreme Court of South Carolina's statement in *Green.*

We have thus independently reviewed the applicable law. From our review, it is immediately apparent that no decision, prior to Green's, required a demonstration that the defendant had been deprived of a fair trial; indeed, the *Green* court acknowledged as much. *Green,* 392 S.E.2d at 160. The heretofore absence of this requirement is significant because the South Carolina courts had granted a new trial at least twice, in *Sanders* and *Anderson,* without mentioning the fair trial element. We also give some weight to the fact that numerous South Carolina decisions had considered the question presented in this case without mentioning the "fair trial" element. *See supra* note 1. Under the facts present here, we can only conclude that the rule in effect prior to Green's case was that he was entitled to a new trial upon a demonstration of the two elements discussed above.

In this light, we must conclude that—prior to the resolution of his direct appeal in 1990—Green would have received a new trial. The change in law—to add the third, so-called "fair trial" element, effectively deprived him of that previously guaranteed right. On these facts, "there exists a liberty or property interest which has been interfered with by the State." *Stewart,* 7 F.3d at 392.

### b.

Having resolved the first question in Green's favor, we next turn to the second issue: "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* Assessing the adequacy of procedure here requires that we balance the interest of the state against those of Green: "[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Wolff,* 418 U.S. at 560, 94 S.Ct. 2963 (quotation omitted). Thus, "[c]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Id.* (quotation omitted).

There are two competing interests underlying our determination of whether Green was afforded sufficient process in connection with this change in law. On one hand, our commonlaw system requires that courts have the opportunity to make law through decisions rendered in individual cases, necessarily requiring that rules will develop and change through the cases themselves. *See Brinkerhoff,* 281 U.S. at 681 n. 8, 50 S.Ct. 451. On the other hand, defendants must have fair warning of the law under which they are tried, and "[t]here can be no doubt that a deprivation of the right of fair warning can result ... from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Co-*

*lumbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). Our task here is to balance these interests, without unduly burdening the right of the state courts to resolve questions under common law or the right of defendants to fair warning.

In this light, a change in substantive law by a state that effects a deprivation of a right can occasion a violation of procedural due process. *See, e.g., Douglas v. Buder,* 412 U.S. 430, 432, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973); *Bouie,* 378 U.S. at 352–55, 84 S.Ct. 1697; *Brinkerhoff-Faris,* 281 U.S. at 681–82, 50 S.Ct. 451; *cf. NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 455, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (discussing state procedure in context of Supreme Court jurisdiction). *Brinkerhoff-Faris* illustrates an application of this principle. There, the Supreme Court of Missouri had held, in a decision preceding Brinkerhoff's case, that a specific state administrative body ("state tax commission") did not have the power to consider an application for tax relief. Then, when Brinkerhoff sought tax relief in state court, the Supreme Court of Missouri held that he could not sue in state court until he had first presented an application for tax relief to the state tax commission. Because the previous rule—barring applications for tax relief to the state tax commission—had been clear and unambiguous, because the change in law was unforeseeable, and because the unforeseeable change effectively deprived the plaintiff of any remedy, the Supreme Court concluded that there had been a Due Process violation. In so holding, the Court noted:

> But our decision in the case at bar is not based on the ground that there has been a retrospective denial of the existence of any right or a retroactive change in the law of remedies. We are not now concerned with the rights of the plaintiff on the merits, although it may be observed that the plaintiff's claim is one arising under the federal Constitution and, consequently, one on which the opinion of

the state court is not final; or with the accuracy of the state court's construction of [state law]. Our present concern is solely with the question whether the plaintiff has been accorded due process in the primary sense—whether it has had an opportunity to present its case and be heard in its support. Undoubtedly, the state court had the power to construe the statute dealing with the state tax commission; and to reexamine and overrule [its own authority]. Neither of these matters raises a federal question; neither is subject to our review. But, while it is for the state courts to determine the adjective as well as the substantive law of the state, they must, in so doing, accord the parties due process of law. Whether acting through its judiciary or through its Legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it.

*Id.* at 681, 50 S.Ct. 451 (footnotes omitted).

■ A defendant thus must establish several elements to prove a deprivation of procedural due process based on a state's change of its law. First, he must establish that there was a clear, settled rule in effect prior to his case. *See Brinkerhoff-Faris,* 281 U.S. at 678, 50 S.Ct. 451 ("Under the settled law of the state, that remedy was the only one available."); *Bouie,* 378 U.S. at 352, 84 S.Ct. 1697 (noting that statutory language was "narrow and precise"); *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963 (noting that statute created "right to good time"); *cf. NAACP,* 357 U.S. at 456, 78 S.Ct. 1163 (noting that prior rule arose from "past unambiguous holdings"). Second, he must establish that the decision in his case constituted a change in the heretofore clearly established rule. *See Brinkerhoff-Faris,* 281 U.S. at 677, 50 S.Ct. 451 ("No one doubted the authority of [a prior holding] until it was expressly overruled in the case at bar."); *Bouie,* 378 U.S. at 352,

84 S.Ct. 1697 (expansion of narrow language); *Wolff,* 418 U.S. at 557, 94 S.Ct. 2963 (denial of right to good time credits); *cf. NAACP,* 357 U.S. at 456, 78 S.Ct. 1163 (change in procedure). Third, the defendant must establish that the change in law effecting a deprivation of a right occurred in the absence of sufficient procedure—that the state did not "afford[ ] to him some real opportunity to protect [his right]." *Brinkerhoff-Faris,* 281 U.S. at 682, 50 S.Ct. 451.

■ Because the first and second elements above are established here, *see supra* at 227, we must focus on the third. Green asserts that he did not receive enough notice (1) to make a record sufficient to satisfy the "fair trial" showing on appeal nor (2) to preserve, brief, or argue against this change in law. Therefore, we have carefully examined the notice that Green was afforded.

In that regard, the prior South Carolina authorities on this issue guide our review. Although South Carolina had, prior to Green's appeal, granted a new trial upon a demonstration of two elements, the Supreme Court of South Carolina had at least suggested, in both its *Weaver* and *Plath* decisions, that a third, "fair trial" showing might be required. Further, there had been no prior explicit rejection, in any decision, of the fair trial element that was ultimately adopted by the court in resolving Green's appeal. *Cf. Brinkerhoff-Faris,* 281 U.S. at 682 n. 9, 50 S.Ct. 451 ("Had there been no previous construction of the statute by the highest court, the plaintiff would, of course, have had to assume the risk that the ultimate interpretation by the highest court might differ from its own."). In assessing the notice given, we also must give weight to the fact that, in the 1999 *Short* decision, the Supreme Court of South Carolina considered the "fair trial" element sufficiently established to necessitate overruling its 1981 *Plath* decision. The Supreme Court has indicated that if prior state law "suggest[ed]" a new rule, then the change of law was

foreseeable, *NAACP,* 357 U.S. at 457, 78 S.Ct. 1163; *accord, Reich v. Collins,* 513 U.S. 106, 112, 115 S.Ct. 547, 130 L.Ed.2d 454 (1994) (reviewing Georgia case law), and in the factual context present here, we thus conclude that the change in law effected in Green's case was reasonably foreseeable.

■■■ We agree with Green that the state was required to afford him "an opportunity to present [his] case and be heard in its support." *Brinkerhoff–Faris,* 281 U.S. at 681, 50 S.Ct. 451. However, we believe that a defendant has sufficient notice to (1) make a record for appeal and (2) preserve, brief, and argue against a change in the law if that change in the law was reasonably foreseeable under the prior applicable law: *See Bouie,* 378 U.S. at 352, 84 S.Ct. 1697 (deprivation of right of fair warning from "unforeseeable and retroactive judicial expansion of narrow and precise statutory language"); *Douglas,* 412 U.S. at 432, 93 S.Ct. 2199 ("unforeseeable application of that interpretation ... deprived petitioner of due process"); *cf. NAACP,* 357 U.S. at 457, 78 S.Ct. 1163 (implying no Due Process violation if petitioner "could ... fairly be deemed to have been apprized of [the] existence [of local procedural rule]"). In reaching our conclusion today, we do not necessarily endorse foreseeability as the benchmark in Due Process claims; we merely conclude that if the change of law was reasonably foreseeable based on indications in prior case law, then the defendant had sufficient notice in the Due Process sense.

### 3.

In so holding, we are acutely aware that changes in applicable law of this kind can produce results reasonably perceived as unfair; however, we are equally cognizant of the Supreme Court's admonition in *Brinkerhoff–Faris:*

> The process of trial and error, of change of decision in order to conform with changing ideas and conditions, is traditional with courts administering the

common law. Since it is for the state courts to interpret and declare the law of the State, it is for them to correct their errors and declare what the law has been as well as what it is.

*Brinkerhoff–Faris,* 281 U.S. at 681 n. 8, 50 S.Ct. 451.

In this context, we must also briefly address the arguments supporting the dissenting opinion of my good friend Judge Motz. Judge Motz appears to endorse the adoption of a rule that when "a state's highest court itself has established and for many years ... consistently adhered to a rule" (*see post* at 232), a departure therefrom is per se unforeseeable. With respect, we cannot agree with this position. The Supreme Court itself has recognized that state courts may overrule clear, established rules consistent with Due Process: "State courts ... may ordinarily overrule their own decisions without offending constitutional guaranties, even though parties may have acted to their prejudice on the faith of earlier decisions." *Brinkerhoff–Faris,* 281 U.S. at 681 n. 8, 50 S.Ct. 451. This observation, in our view, undermines any notion of a per se bar on changing a clear and established rule.

This brings us to what "process" must be provided in any specific case, and we have concluded that a reasonably foreseeable change in law satisfies the Due Process requirement. On this point, Judge Motz asserts that the suggestions incorporated into *Weaver* and *Plath* were insufficient to make a change in the law reasonably foreseeable. Again, we must disagree. Of course the "suggestions" forecasting a change in law will not come in controlling authority, for if those suggestions had, they would have constituted the change in law themselves. In other words, something not co-extensive with the actual change in law must be sufficient to meet the measure of "reasonable foreseeability." While we cannot say that indications in prior case law will always be sufficient, we have concluded that the indications in *Weaver* and *Plath* were suf-

ficiently analogous to the debate that might ensue when a state's highest court is considering a question in the first instance that counsel here had notice in the Due Process sense. Any other approach would tend to convert any change in law into a federal Due Process violation. In short, we simply do not believe that the change of law effected here deprived Green of procedural due process,[3] and the approach endorsed by Judge Motz would be likely to constrain development of the common law. Green's claim thus fails.

## C.

Next, we address Green's assertion that he was deprived of effective assistance of counsel at the sentencing stage. Specifically, he maintains that his counsel was deficient in failing to submit two mitigating factors to the jury: (1) lack of future dangerousness, and (2) adaptability to prison life. The state PCR court, federal magistrate judge, and district court each rejected this claim. We have carefully considered Green's asserted instances of ineffective assistance, and we are convinced that the state PCR court properly rejected these claims. In any case, we certainly cannot conclude that the dismissal of these claims was unreasonable under *Williams, supra.*

## III.

For above-stated reasons, we affirm the denial of Green's petition for habeas corpus.

*AFFIRMED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

I agree with most of Judge King's fine opinion. I agree that a "clear, settled rule" existed in South Carolina prior to Green's case. *Ante* at 229. I agree that this rule provided that a defendant was entitled to a new trial (1) if he had wasted a peremptory challenge on a juror who should have been excused for cause and (2) had exhausted his peremptory challenges before the jury was impaneled. I agree that Green satisfied both portions of this rule. I agree that the Supreme Court of South Carolina's holding that Green must demonstrate an additional element—deprivation of a fair trial, or actual prejudice—constituted a change in this established rule. And I agree that such a change, unless reasonably foreseeable, requires reversal, because if Green could not foresee the change, he would not have had the opportunity to develop at trial a record that could support a finding of prejudice. These are the difficult questions presented by the case; the majority persuasively and correctly deals with all of them. Yet it slips in its ultimate holding, somehow finding that Green could have foreseen the abolition of this settled state rule in his case. From that ultimate holding, I must respectfully dissent.

As the majority recognizes, more than eighty years ago, the Supreme Court of South Carolina established the clear rule at issue here, a rule under which a petitioner need not demonstrate actual prejudice. *See State v. Sanders,* 103 S.C. 216, 88 S.E. 10, 12 (1916). Moreover, South Carolina's highest court has followed that rule on numerous occasions. *See, e.g., State v. Short,* 333 S.C. 473, 511 S.E.2d 358, 360 (1999); *State v. South,* 285 S.C. 529, 331 S.E.2d 775, 778 (1985); *State v. Elmore,* 279 S.C. 417, 308 S.E.2d 781, 784 (1983); *State v. Hardee,* 279 S.C. 409, 308 S.E.2d 521, 524 (1983); *State v. Anderson,* 276 S.C. 578, 281 S.E.2d 111, 112 (1981); *State v. Britt,* 237 S.C. 293, 117 S.E.2d 379, 385–86 (1960); *State v. Gregory,* 172 S.C. 329, 174 S.E. 10, 11 (1934); *State v. King,* 158 S.C. 251, 155 S.E. 409, 420 (1930); *see also Moore v. Jenkins,* 304 S.C. 544, 405 S.E.2d 833, 835 (1991) (finding "prejudicial

---

**3.** Because we conclude that the South Carolina courts correctly rejected Green's Due Process claim, that decision was, by defini-

tion, not unreasonable in the *Williams* sense. *Williams,* —— U.S. at ——, 120 S.Ct. at 1523.

as a matter of law" the method of allotting peremptory strikes in a multiple-defendant case by which each party, rather than each side, exercised the statutorily-mandated number of strikes); William Shepard McAninch & W. Gaston Fairey, *The Criminal Law of South Carolina* 146 (2d ed. 1989) ("South Carolina treats the wrongful deprivation of a peremptory challenge as error per se so long as all peremptory challenges are exhausted."). As the majority observes, "it is immediately apparent that no decision, prior to Green's, required a demonstration that the defendant had been deprived of a fair trial; indeed, the [Supreme Court of South Carolina in] *Green* ... acknowledged as much." *Ante* at 227. Nevertheless, the majority concludes that prior to Green's case, the Supreme Court of South Carolina "suggested" a change in this long established rule, making that change "foreseeable" by Green.

How is that possible? The majority's conclusion seems to me to be paradoxical. I have not found a single case (and the majority cites none) which has held, as the majority does here, that a state's supreme court, after establishing and for eighty years invariably following a "clear, settled rule," has somehow simultaneously "suggested" a radical change in that rule. A state rule is not clear and settled for due process purposes until enunciated by the state's highest court. When "there [has] been no previous" ruling on point by that court, a litigant must "assume the risk that the ultimate interpretation by the highest court might differ from its own." *See Brinkerhoff–Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673, 682 n. 9, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). Indeed, even if a litigant relies on a valid state court decision, the state's highest court may overrule that decision without violating the litigant's due process rights. But when, as here, a state's highest court itself has established and for many years so consistently adhered to a rule such that it is "clear" and "settled," how can a litigant, consistent with Due Process, be required to "assume

the risk" that the highest court will refuse to follow its own established rule in his case? The answer is that he cannot.

Rather, as the Supreme Court noted in *Brinkerhoff–Faris*, when a state's highest court has clearly established a rule as "the settled law of the State, ... it would ... be[ ] entirely futile" for a litigant to pursue a defense based on the possibility that the rule might be different in his case. 281 U.S. at 678–79, 50 S.Ct. 451. Indeed, it would run contrary to our expectation that litigants assert only potentially meritorious arguments to require them to present a defense on the assumption that a "clear, settled rule" established and consistently followed by the state's highest court might change. Yet such is the effect of the majority's holding.

To support its conclusion that the Supreme Court of South Carolina "suggested" a change in its own clear and settled rule requiring no showing of prejudice, the majority relies on *State v. Weaver*, 58 S.C. 106, 36 S.E. 499, 501 (1900), and *State v. Plath*, 277 S.C. 126, 284 S.E.2d 221, 227 (1981). But the Supreme Court of South Carolina decided *Sanders*, establishing this rule, sixteen years after *Weaver*, thus implicitly overruling any holding to the contrary in *Weaver*. Moreover, just last year in *Short*, the Supreme Court of South Carolina carefully explained that *Plath* did *not* govern cases like that at hand. *See* 511 S.E.2d at 360–61 (explaining that *Plath* did not address *timely* peremptory challenges improperly denied during the normal course of voir dire, but rather addressed only *belated* peremptory challenges, asserted after the jury had been impaneled). In *Short*, South Carolina's highest court not only extended its rule requiring no showing of actual prejudice to *belated* peremptory challenges, but also, and more importantly for our purposes, emphasized that it had always followed and continued to follow this well-established rule for *timely* peremptory challenges. *Id.*

In sum, the two cases—*Weaver* and *Plath*—that form the entire basis of the majority's "foreseeability" holding do not provide any evidence that the Supreme Court of South Carolina contemplated changing its well-established rule to require an additional element. *Weaver* is 100 years old and was implicitly overruled by South Carolina's highest court more than 80 years ago; as for *Plath*, the Supreme Court of South Carolina has expressly stated that *Plath* never applied to or governed cases like that at hand. The majority's reliance on these two non-controlling cases to hold that Green should have foreseen a radical change in well-established state law is directly contrary to the Supreme Court's express refusal to lend non-controlling cases such weight. *See Bouie v. City of Columbia*, 378 U.S. 347, 357–59, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (rejecting contention that indications of change in state civil trespass law should have led a litigant to anticipate a change in criminal trespass law).*

In this case, no one disputes that the state trial court clearly erred in failing to disqualify a juror for prejudice on the basis of his racial bias, and today's opinion correctly holds that under the clear and settled state rule in effect at the time, that error warranted a new trial. And yet the majority looks to cases that the state's highest court has either overruled or deemed non-controlling to find that even though the trial court erred, even though on appeal the state rule was changed only for this one petitioner, still his counsel could have foreseen, from review of such non-controlling case law, that the state rule could change. I cannot vote to uphold a capital conviction when a defendant has not had a full opportunity to demonstrate prejudice in the composition of the jury that convicted him. I therefore respectfully dissent.

---

* The majority nevertheless maintains that hints of a change in law must necessarily come in non-controlling case law. I respectfully suggest that a hint could lie in a subsequent case on point that declined to reach the relevant issue, or a subsequent case on point that followed doctrine but suggested misgivings in dicta, or a subsequent case on point from a lower court that criticized the relevant rule of law.